[Crim. No. 2212.   Second Appellate District, Division One.—September 6, 1932.]

THE PEOPLE, Respondent, v. CHARLES PETER, Appellant.

Frederic H. Vercoe, Public Defender, and G. A. Benedict, Deputy Public Defender, for Appellant.

U. S. Webb, Attorney-General, and Frank Richards, Deputy Attorney-General, for Respondent.

TAPPAAN, J., *pro tem.*—Appellant was convicted after a trial had before a jury of murder of the second degree, and appeals from the judgment as entered against him on the verdict and from the order denying him a new trial. Appellant also appeals from the order denying his motion for change of verdict from murder of the second degree to manslaughter. ■ As to this attempted appeal from the order denying appellant's motion for modification of the verdict of murder of the second degree to one of manslaughter, it would appear that this is not an appealable order, as it was made before judgment (Pen. Code, sec. 1237), but the matter may properly be reviewed on the appeal from the judgment and the order denying appellant's motion for a new trial.

The facts and circumstances which culminated in the killing here involved, as disclosed by the record, are somewhat entangled, and the evidence produced at the trial, at times, is sharply conflicting. Appellant shot and killed one Alex Usucke on Thanksgiving Day, 1931. The homicide occurred at the home of one Mrs. Eros, where both appellant and deceased lived. The deceased was shot at about 7 o'clock in the evening, after a day spent in a sordid celebration of the holiday. The participants in this so-called "party" were all Hungarians or made use of the Hungarian language. At about 8 o'clock in the morning of the day of the homicide, appellant, deceased, Steve Toth and Julius Klemper gathered at the home of Mrs. Eros. Klemper had at one time lived at Mrs. Eros' house, but some little time before the events herein narrated had moved away owing

Mrs. Eros some room rent. At some time during the morning, deceased, Toth and Klemper left the house and later returned with liquor, which was consumed by the persons at the house. Mrs. Eros then left the house and did not return until the late afternoon. At about 11 o'clock dinner was prepared and eaten. After the noonday meal, the four men engaged in a card game. Wine which appellant had made two or three weeks before was served. Toth and then appellant left the game. Appellant lay down upon a couch in the room where the game was being continued by deceased and Klemper. After a time appellant jumped from the couch, turned out the light and told Klemper to go home, that he did not pay any room rent there; that he did not belong there, and that he owed the landlady room rent. To this Klemper replied that he owed the landlady, but did not owe appellant anything. Klemper then said to deceased, "Let's go, Alex," whereupon appellant called him an opprobrious name. At this point deceased joined in the controversy and objected to the language used by appellant. Appellant and Klemper engaged in a scuffle, a knife being made use of by one of the combatants, and appellant receiving a cut upon his hand. At this point the evidence is conflicting, but from the testimony of the witnesses other than Klemper, it appears that deceased, Toth and Klemper left the house and proceeded some distance to the home of a friend where they had some wine before returning again to Mrs. Eros' house. During this same time appellant called the police and was by them taken to a police station, where his hand was dressed by a police surgeon, and he then returned with a police officer to the Eros home. Mrs. Eros returned shortly before appellant and the officer arrived. As to what occurred next, the evidence is in conflict. Klemper testified that the card game, hereinbefore referred to, took place, and that the deceased was shot by appellant as the culmination of the controversy that took place at that time; while appellant and Mrs. Eros testified that, after appellant and the police officer had returned to the Eros home, deceased and Klemper came into the house through the back door, and that, at this time, appellant was sitting in his room on the bed. Mrs. Eros testified that at this time Klemper took a knife out of a drawer of the kitchen table and that deceased had his own

knife in his hand. That they said "your life is out, we go and get you". That Klemper and deceased were in appellant's room fighting. That she heard Klemper say, while he had appellant by the throat, "I am out to get your life." That then she heard the shot and saw deceased come out of the room and fall down and Klemper run from the house. Appellant testified that he heard deceased say, "We do now finish Charlie." That deceased then came into his room with a knife. Appellant does not deny the shooting, though at a later date he said it was accidental, and at another time he said, "Ya. Couldn't help it. He called me son-of-a-bitch 4 or 5 times. . . . He followed me and he called me son-of-a-bitch." After the shooting, appellant testified that he went to another house and tried to call the police. The police found appellant waiting in the front yard when they arrived shortly after the shooting, and appellant then gave them a number of unshot cartridges. There is some evidence that after the fatal shot appellant went outside the house and fired his gun a number of times in the air. There is also evidence that at a prior date Klemper and appellant had had words at a drinking bout held at the Eros home. It would seem that the theory of the prosecution was that appellant, while attempting to shoot Klemper, fired the shot that resulted in the death of deceased.

Appellant's specifications of error, some fifteen in number, refer in many instances to rulings made by the trial court in the giving and refusal to give certain instructions to the jury. In view of the decision reached by this court upon this appeal, it becomes unnecessary to review many of these alleged errors, the questions presented being now immaterial.

█ Appellant assigns as error the refusal of the court to give the following instruction: "As to verbal statements, or as they are sometimes called, extrajudicial statements, that is, statements made by the defendant out of court, you have a right to consider that there is danger of mistake and misapprehension of the witnesses; the misuse of the words; the failure of the party to express his own meaning; the infirmity of memory on the part of the witness attempting to relate all the conversation. It frequently happens also that the witness by unintentionally altering a few of the expressions used gives an effect to the statement com-

pletely at variance with what the party actually did say. The weight and effect, however, of this evidence is for you to determine."

Appellant bases, in large part, his contention that he was prejudiced by the court's refusal to so instruct the jury, upon the fact that many of the persons involved in the transaction referred to spoke Hungarian as their mother tongue, and could converse but brokenly in the English language. From an examination of the record, it clearly appears that the witnesses in testifying as to these statements of which appellant complains, gave their evidence in such a manner that the jury had before it not only the statements, but also the surrounding circumstances. In testifying as to the language used, the witnesses in most cases attempted to give words actually made use of rather than the proper English word. We find in the record, for example, "ya ya" used for "yes". The jury had the transaction placed before them, and it was their duty to consider this evidence with the same care as other competent evidence submitted to them. The subject matter contained in the questioned instruction might have provided the basis for argument before the jury, but under the circumstances presented in the instant case, would have withdrawn from the jury their right to consider this particular evidence in the same way as the other evidence produced at the trial. It should be noted that in the case at bar the statements were attributed to persons who had difficulty in "expression" and, therefore, should be differentiated from those cases in which cautionary instructions are sometimes given, where the statement is that of a "child of tender years". The court properly exercised its discretion in refusing to give the requested instruction.

■ Appellant contends that another instruction requested by him should have been given. This instruction had to do with the jury's consideration of the testimony of the defendant. The court gave a general instruction pertaining to the credibility of witnesses, and in view of this it was not error on the part of the court to refuse to give the particular instruction so requested. (*People* v. *Miller*, 112 Cal. App. 535, 538 [297 Pac. 40].)

■ The court was justified by the evidence introduced at the trial, in giving the following instruction and the

statement of law therein contained was not open to criticism under the circumstances of the instant case (*People* v. *Hecker*, 109 Cal. 451, 562 et seq. [30 L. R. A. 403, 42 Pac. 307]): ''Whenever an assault is brought upon a person by his own procurement, or under an appearance of hostility which he himself creates, with a view of having his adversary act upon it, and he so acts and is killed, the plea of self-defense under such circumstances is unavailing.''

■ Appellant attempted to impeach the witness Klemper by the introduction of his testimony given at the preliminary examination had in the cause. From an examination of the record it clearly appears that the testimony given at the preliminary hearing referred to a time other than that referred to in the answer made by the witness at the trial, and therefore was not impeaching, but immaterial as to the question presented.

■ Appellant complains of the action of the court in the overruling of an objection interposed by him to a question asked of one of his witnesses upon cross-examination. This witness, Mrs. Eros, had just testified to the fact that appellant had lived in her home for thirteen years. She was then asked if she and appellant had not lived together as husband and wife. Over objection to this question, the witness answered ''No.'' This evidence was admitted for the sole purpose of showing motive, if any, on the part of the witness, and the jury at the time of the admission of the evidence were so instructed by the court. A witness is presumed to speak the truth, but this presumption may be repelled in a number of ways, among them by showing as to his motive. (Code Civ. Proc., sec. 1847.) Motive, being a condition of the human mind, is impossible of direct proof, but must be shown by condition, circumstance, act or statement of the witness. If the witness had lived with appellant in the relationship of husband and wife, this circumstance would, without doubt, be one which the jury could rightly consider as a factor in arriving at the motive of the witness and the weight to be given to her testimony. There was no error committed by the court in the overruling of appellant's objection.

■ Appellant complains of a part of a general instruction given by the court on the credibility of witnesses: ''A

witness may be impeached . . . by evidence affecting his or her character for truth, honesty or integrity.'' The fact that the court may have given an instruction which had no application to the evidence, standing alone, will not justify the reversal of a judgment. In addition, it must appear that the appellant was in some way prejudiced by the instruction. Appellant contends that when this instruction is considered in connection with the question asked of the witness Eros, whether she had lived with appellant as his wife, such prejudice is made to appear. With this contention we cannot agree. The jury were instructed by the court clearly and fully that the question and answer were to be considered by them for a limited purpose only—the ascertainment of motive. The question being properly asked and answered, the appellant cannot now complain. Appellant did not suffer prejudice within the rule.

▮ Appellant's remaining specifications of error are directed to certain rulings of the court overruling objection interposed by appellant to certain questions asked witnesses upon cross-examination. From an examination of the record, it appears that appellant failed to make timely objection. (*People* v. *Gilman*, 43 Cal. App. 451, 453 [185 Pac. 310].) The evidence of itself was not of importance and was not unfavorable to appellant. In the other instance cited by appellant, the matter was also unimportant, and the cross-examination was as to matters which could fairly be said to be implied from the testimony given in chief.

In *People* v. *Tyren*, 179 Cal. 575, at page 579 [178 Pac. 132, 134], it is said: ''It was not error to permit the defendant to be cross-examined on this subject. Where a defendant testifies in his own behlaf, he may be cross-examined 'as to all matters about which he was examined in chief'. (Pen. Code, sec. 1323.) 'The cross-examination may extend to the whole transaction, of which he gives a part' (*People* v. *Teshara*, 141 Cal. 633 [75 Pac. 338]), and may be directed to the eliciting of any matter which may tend to overcome or qualify the effect of the testimony given by him on his direct examination.''

The various specifications of error which we have discussed at length herein are, in most instances, of a highly technical character, and we cannot but agree with a statement contained in appellant's reply brief: ''We do not

claim that *each* of our Points are exceedingly weighty.'' In all fairness to appellant, it must be stated that this statement just above quoted was coupled with a statement to the effect that the verdict of murder of the second degree was ''Incomprehensible'' under the evidence contained in the record here.

■ Appellant contends that the evidence, taken as a whole, is insufficient to support the verdict of murder in the second degree. With this contention we are constrained to agree. We have examined the evidence in this case with minute care. Appellant was properly found guilty on competent evidence of a most serious offense, and the errors, if any, did not prejudicially contribute toward bringing about the finding that appellant killed the deceased. ''No miscarriage of justice, therefore, resulted, except that, as a matter of law, the jury improperly fixed the degree of the crime and imposed the penalty therefor. That injustice may now be righted without subjecting the state and the defendant to the delay and expense of a new trial.'' (*People* v. *Kelley,* 208 Cal. 387, 393 [281 Pac. 609, 611]; Pen. Code, sec. 1181, subd. 6.)

The facts of the case have already been stated and further analysis of the evidence seems unnecessary. The record discloses that the homicide closed a long day of drinking and controversy had by appellant, the deceased and the witnesses. It would appear that such days were not unusual in the home of Mrs. Eros, and that the actors in this tragedy had passed like days at her home at other times. The character, mentality and surroundings of the persons who took part in the transaction but too clearly appear from the word picture presented in the record. The fact that appellant stood dumbly by, after the killing, waiting for the police officers to arrive, is strongly indicative of his mental condition. The following statement, found in the case of *People* v. *Kelley, supra,* at page 393, applies with equal force to the case at bar:

''Nor can we bring ourselves to believe that there was a wilful, deliberate and premeditated killing. . . . No express malice was shown, for there was not manifested a deliberate, or any, intention to unlawfully take the life of a fellow creature, and the circumstances attending the kill-

ing in this case, as proved, do not show an abandoned and malignant heart.''

The appeal from the order denying appellant's motion for modification of the verdict, as heretofore noted, not being subject to review, is dismissed.

The judgment of the lower court of murder of the second degree is modified. The cause is remanded to the trial court, with directions to enter a judgment against the defendant finding him guilty of manslaughter, and to thereupon pronounce judgment upon him as prescribed by law.

Conrey, P. J., and York, J., concurred.