[Crim. No. 3263. Second Appellate District, Division One.—December 11, 1939.]

THE PEOPLE, Respondent, v. FRANK C. PAYTON, Appellant.

Alexander L. Oster for Appellant.

Earl Warren, Attorney-General, and Walter L. Bowers, Deputy Attorney-General, for Respondent.

WHITE, J.—Defendant appeals from the judgment pronounced following his conviction of the crime of grand theft. ▪ Viewing the evidence in the light most favorable to the prosecution, as we are bound to do following a guilty verdict, we find in the record, testimony to the effect that defendant, a man about 38 years of age, who had lived in Los Angeles County practically all his life, was employed for some twelve years as a hay salesman, and at the time here pertinent was working in that capacity for his brother, the latter of whom was a wholesale hay dealer. Mr. Zualet, the complaining witness, was a dairyman at Artesia in Los Angeles County. He had known the defendant for about three years and had previously purchased any from him. In connection with the occasion which forms the basis of the instant charge there is testimony that about October 8, 1938, defendant called at Zualet's dairy to try to sell the latter some hay. Mr. Zualet did not have a barn in which to store hay, and was interested in buying hay in storage that he could withdraw from time to time as he needed it. Defendant then informed the complainant that a Mr. Rieger had some hay in storage with a big barn and promised to see what hay the latter had. On that same day the defendant went to Rieger's wholesale hay yard at 2902–2908 Flower Street in Hynes and told Reiger that he had a dairyman who wanted 100 tons of alfalfa hay, asking if Rieger would have that amount on hand the following morning. Receiving an affirmative reply, defendant returned the next morning about 7:30 o'clock and examined the hay at Rieger's yard. Informing Rieger that he was going after the dairyman to bring him over to look at the hay, defendant departed, returning about 9 o'clock in company with Mr. Zualet. Upon this occasion there were about 100 tons of bailed alfalfa hay on trucks in the yard. Defendant and Zualet examined it. The former in the presence of the latter asked Rieger the price, and the sum of $14 per

ton was quoted. There was some talk about storing the hay, and then the three walked to the warehouse to show the prospective customer Zualet where the hay would be stored. In the warehouse there were two sections, numbered 23 and 24, each of which contained some alfalfa hay, upon which Rieger also quoted a price of $14 per ton to the defendant and Zualet. Reiger then went and got the warehouse records of his hay, the number of bales and the weight, noting them on a slip of paper which he gave to the defendant. Rieger then left and went to his office, and defendant and Zualet remained some fifteen or twenty minutes in the yard examining the hay. Defendant then sought out Mr. Rieger and asked him if he would keep this hay until 2 o'clock, because the complainant, Zualet, was figuring on leasing a building; to which Rieger replied that he guessed the hay would still be there. However, at 2 o'clock the defendant returned and told Mr. Rieger the deal for the hay was off. It appears that the price quoted was to include storage up to the following June 1st, but the insurance was to be extra at the rate of three per cent of the purchase price. Defendant did not again see Rieger until after the former was arrested and at the time of his preliminary hearing.

After defendant and Zualet left Rieger's place on the morning of October 9th they did not see each other again until defendant went back to Zualet's dairy in the latter part of the afternoon of October 11th, between 3 and 4:30 o'clock. At that time they discussed the hay deal, defendant endeavoring to persuade Zualet to pay the $14 and the latter insisting he would pay only $13.50 per ton. Finally defendant advised the complainant that he was going to see Mr. Rieger again and endeavor to induce him to sell the hay for $13.50. Defendant then left the complainant's place and came back later that same evening, telling the latter that he could have the hay at $13.50 per ton. Upon this last-named occasion the defendant asked the complainant for a check, and the latter in reply asked the defendant if he had the necessary papers. Defendant said he would bring them the following day and Zualet promised to give him the check at that time.

About 7 o'clock on the following morning, October 12, 1938, Columbus Day, a legal holiday, defendant met with a fellow salesman, Ray Koopman, at defendant's brother's place in

Norwalk, for whom they both worked as hay salesmen, and defendant asked Koopman if the latter wanted to ride along with him, which invitation Koopman accepted, and they drove away in the defendant's brother's car, the defendant telling Koopman that he had a deal on and asking the latter if he had a typewriter, saying, according to Koopman, that "he wanted to make out a sort of receipt or something to confirm the sale if it was made". Defendant and Koopman drove to the home of the latter's father and there procured Koopman's sister to typewrite a paper spoken of in the evidence as a receipt and reading as follows:

"October 12, 1938.

"Sold to Zualet Brothers, by Frank Payton, alfalfa hay stored in warehouse on Flower Street in Hynes, Sections 23 and 24 of the warehouse.

373 bales, 47,177 pounds,
366 bales, 43,149 pounds,

Total 90,326 pounds at $13.50 per ton, $609.70.

"(Signed) FRANK PAYTON."

This instrument was typed by Koopman's sister at the request of the defendant, and from the information given by defendant as well as from figures which he had on a paper that he read from.

Leaving Koopman's father's place, defendant and Koopman drove over to the complainant's place, arriving there about 8:30. Defendant said that he had brought the papers, and Zualet handed defendant his checkbook and asked the latter to make out the check. Zualet had previously dealt with defendant in connection with the purchase of hay and on these former occasions had asked the defendant to write out the body of the checks for him because of Mr. Zualet's meager knowledge of the English language and his impaired ability to write. Defendant wrote two checks, one for $22.50 and one for $587.20, totaling the $609.70 alleged in the information to have been stolen. He filled in the date and the amount of the checks, but left the names of the payees blank. He handed the checks to Zualet and the latter signed them as the drawer thereof. Both checks were drawn on the First National Bank of Bellflower. When the checks were delivered to defendant the latter signed the so-called receipt heretofore referred to and gave it to Zualet.

Following the receipt of the two checks from the complainant, defendant and Koopman drove to Bellflower, a distance of about two miles, and stopped in front of the Central Market, where defendant said to Koopman, "Well, it is a holiday today, isn't it?" to which Koopman replied, "I guess so." Thereupon defendant handed Koopman the $22.50 check and said, "I got a small check I would like cashed to get some clothes," and asked Koopman if he could cash it for him. Koopman took the check into the Central Market, where he was known, got a pencil and filled his own name in as payee, endorsed the check and cashed the same. Receiving the money, he went outside to the automobile where defendant was waiting, and gave the $22.50 to the latter, who paid Koopman $5 which he owed him. There is also evidence that Koopman had previously cashed checks for the defendant.

On the following morning, October 13th, defendant and Koopman drove to Bellflower and parked directly across the street from the First National Bank. It was about 10 o'clock, and after they got out of the car defendant handed a folded check to Koopman and asked him if he would cash it for him. Koopman went into the bank, opened the check, noticed the absence of a payee thereon, and filled in his own name as such, cashing the check in the bank. Leaving the bank, Koopman walked across the street to the automobile and gave the defendant the money. At that time one R. G. Curtis came upon the scene, and defendant gave him $40 he had borrowed a few days before. That same afternoon defendant, together with Koopman, a Miss Emens and another woman left by automobile for San Francisco, arriving there the following day. While there they visited the Bay Meadows race track, and the expense of the entire trip was paid for by defendant. On the last-named day Koopman borrowed some money from defendant to enable him to pay his bus fare back to Los Angeles and returned home, arriving on the 15th. There is testimony that defendant had a large roll of paper money with him on the trip, out of which he paid the expenses. Defendant remained on the trip some ten days after Koopman's return. The two checks in question were paid by the bank and charged against the account of the complainant. The latter never received any hay from Mr. Rieger on this transaction, but did subsequently purchase

some hay direct from Mr. Rieger, paying the latter therefor. The evidence indicates that at the time complainant delivered the checks to the defendant he believed defendant had the right to sell the hay in question and that he gave the checks in payment therefor. The hay dealer, Mr. Rieger, testified that defendant was not employed by him and that he never saw the receipt until it was subsequently shown to him by a police officer. He never authorized defendant to make out any such receipt and stated the fact to be that the defendant told him the deal was off. According to Rieger's testimony, his first knowledge that defendant had sold his hay to Mr. Zualet was about October 15th or 16th, when Mr. Zualet called at Rieger's office.

Testifying as a witness in his own behalf, defendant admitted signing the so-called receipt, delivering the same to the complainant and receiving from the latter the checks in question. Defendant admitted he asked Koopman to cash the $22.50 check, which he said was made out in that amount as his commission for making the deal. With reference to the larger check, defendant testified that on the morning of October 13th he gave the check to Mr. Koopman with instructions to deliver the same to Mr. Rieger and that it was his belief, up to the time of his arrest, that Koopman had done so.

The first contention of appellant is that the evidence is insufficient to support the judgment. Appellant's claim in this regard, that because he was charged with the theft of $609.70 of the personal property of Zualet when under the facts of the case he could be charged with the embezzlement of $587.20 of the personal property of P. J. Rieger, the seller of the hay, and could and would thereby be placed in jeopardy twice for the same offense, is untenable. The amendment of Penal Code section 484 in 1927 merged into the crime of theft the then existing crimes of larceny, embezzlement and obtaining money by false pretenses. (*People v. McCarthy,* 140 Cal. App. 386 [35 Pac. (2d) 621]; *People v. Breyer,* 139 Cal. App. 547 [34 Pac. (2d) 1065]; *People v. Bratten,* 137 Cal. App. 658 [31. Pac. (2d) 210].) Therefore the amended information charging grand theft included both the offenses of embezzlement and obtaining money by false pretenses. The court fully instructed the jury with reference to the crime of grand theft, including the obtain-

ing of money by false pretenses, as well as the elements necessary to establish the same. The jury was also correctly advised by appropriate instructions as to larceny by trick and device and the necessary ingredients thereof; and as well were correctly instructed concerning the crime of theft by means of embezzlement. By their verdict the jury necessarily found that the crime committed by defendant consisted of his taking $609.70 belonging to the complaining witness Zualet, thereby determining that the money did not belong to Mr. Rieger and consequently was not taken from the latter. Such a conclusion finds ample support in the testimony of Mr. Rieger himself when he testified that the appellant was not in his employ; that he had never employed him though he had paid him a commission on a sale of hay on a different occasion, but that he did not tell appellant he would pay him any commission on this occasion, and in fact was advised by appellant that the deal was not consummated. Mr. Rieger testified he never saw either of the two checks issued by Mr. Zualet and delivered to appellant; never saw the receipt or bill of sale for the hay until it was shown to him by an officer, and that he never authorized appellant to sign or deliver any such instrument. Appellant admitted he was employed by his brother and not by Rieger. The record is barren of any testimony that appellant was entrusted with the hay or that he was given any authorization to deliver it or transfer title to it. In fact, appellant's statement that he was to receive fifty cents per ton commission was based solely upon his conclusion and understanding from previous transactions. On the other hand, the evidence admits of but one conclusion, and that is that appellant clearly led the complaining witness to believe that the latter was buying Rieger's hay stored in Rieger's barn. Finally, Mr. Rieger parted with nothing, and the only person defrauded was complainant, Zualet, who lost $609.70, and the jury by its verdict so determined.

Appellant next challenges the sufficiency of the evidence on the ground that the witness Koopman was an accomplice and that his testimony was not corroborated as required under section 1111 of the Penal Code. We have no hesitancy in saying that Koopman was not an accomplice, and even if he were, his testimony was abundantly corroborated. We are not here confronted with the situation usually sur-

rounding a trial when the question of whether a witness is an accomplice is one of law for the court. That occurs, it is true, when the accomplice comes upon the stand admitting his complicity in the commission of the offense; but where, as here, the witness denied any criminality or participation in any unlawful scheme with the defendant, the question of whether he was an accomplice was for the jury to determine, and under the evidence produced they were entitled to determine as a fact that Koopman was not an accomplice. As is said in Corpus Juris, volume 16, page 677, "the question of accomplicity is one to be decided by the jury where, although there is evidence tending to connect the witness with the crime, the facts are disputed or susceptible of different inferences".

The jury was fully and correctly instructed as to what constitutes an accomplice, and the court was correct in submitting to them for determination that question so far as the witness Koopman was concerned. ■ That Koopman was not an accomplice seems to us to be clearly established by the testimony of appellant himself, which was that he asked Koopman to cash the $22.50 check for him and received the proceeds thereof; while as to the $587.20 check appellant never contended that Koopman aided or abetted or assisted him by cashing the other check for $587.20, but, on the contrary, insisted that he gave Koopman that check to deliver to Rieger to pay for the hay, and that he never saw the proceeds of the same, thereby negativing any claim that appellant and Koopman were accomplices, but, on the contrary, contending that appellant was innocent and that Koopman was the guilty party.

■ Concerning corroboration of Koopman's testimony, we find appellant's admission that he personally wrote out the body of the two checks leaving the names of the payees blank; that he received the checks in payment for hay he was never authorized to sell or deliver for $13.50 per ton, and in fact hay concerning which he himself advised the seller that the deal for its sale was off. Appellant further admitted by his own testimony that he obtained a portion of the property secured from Zualet when he received the $22.50 represented by the check which Koopman cashed at appellant's request. Concerning appellant's contention that Koopman's testimony lacks corroboration in regard to the re-

ceipt and disposition of the proceeds of the larger check of $587.20, it is sufficient answer to say that Koopman is admittedly corroborated as to other material testimony, such as the cashing of the $22.50 check and the delivery of the proceeds thereof to appellant. It needs no citation of authority for the statement that if the accomplice is corroborated as to some material fact or facts this is sufficient to authorize an inference by the jury that he has truly testified with respect to matters as to which he has not been corroborated, and thus to sustain a conviction. Further, it is well settled that the testimony of an accomplice need not be corroborated by direct evidence. The entire conduct of defendant may be inquired into for the corroborating circumstances, and if from such conduct and behavior on the part of the defendant the connection of the accused with the crime may be fairly inferred, the corroboration is sufficient. (*People* v. *Entriken,* 106 Cal. App. 29, 35 [288 Pac. 788]; *People* v. *Schumann-Heink,* 106 Cal. App. 81, 87 [288 Pac. 838].)

From a review of the evidence narrated herein, as well as from other facts and circumstances appearing in the record, we have no hesitancy in saying that the corroborating evidence was sufficient to connect the defendant with the commission of the offense. One might remove from the record in this case the testimony of Koopman, and there would yet remain sufficient evidence from which the connection of the appellant with the alleged crime might reasonably be inferred. Briefly, such circumstances might be summarized as follows: The defendant accepted $13.50 per ton from Zualet when Rieger had refused to sell the hay for less than $14 per ton; he made out the checks himself, leaving the payee's name blank instead of making at least the larger check which was admittedly due Rieger show the latter as payee; that appellant received the proceeds of the $22.50 check out of which he repaid Koopman $5; that on the morning the larger check was cashed, while appellant and Koopman were together in the vicinity of the bank, defendant repaid one Curtis $40 which he had borrowed from him; and further, the defendant, who had been compelled to borrow small sums from Koopman and Curtis just previously, was nevertheless financially able on the day the $587.20 check was cashed, to take Koopman and two women to San Francisco.

Appellant's further claim of insufficiency of the evidence, based as it is upon the contention that the only element of the theft upon which a conviction could be had under the instructions in this case is that of false pretenses and that the evidence in this respect fails to conform to the requirements of section 1110 of the Penal Code in that there is no false token or writing, and that any alleged false pretense on the part of appellant is not established by two witnesses or by one witness and corroborating circumstances, is without merit. In the case before us there is a memorandum in writing executed by defendant, and the same fully conforms to the requirements of a false token or writing demanded by section 1110. There is abundant evidence that the writing in the instant case served to carry out the false pretense, that it contained some statement thereof, and was based upon such false pretense. That is all that is required. (*People* v. *Pearson,* 69 Cal. App. 524, 531 [231 Pac. 612].) The purported bill of sale or token was false in that it purported to make the sale of hay when the appellant had no such hay, the commodity in fact belonging to Rieger; that defendant had no authority to execute such a bill of sale and certainly had no authority to execute a bill of sale of Rieger's hay for less than $14 per ton. It was used to lend strength to the false pretenses, and although it had neither value nor validity it served to convince the complaining witness Zualet of the right of appellant to transfer title to the property in question. Also a reading of the testimony, much of which is set out in this opinion, leads inevitably to the conclusion that there was a compliance with the latter portion of section 1110 in that the pretenses were proven by the testimony of the complaining witness and corroborating circumstances, which need not here be reiterated. It is sufficient if the testimony of the person defrauded is satisfactorily corroborated by material circumstances. That such corroboration of the complaining witness was presented in this case cannot be denied. (*People* v. *La France,* 28 Cal. App. (2d) 152, 156 [82 Pac. (2d) 465].) Conceding the existence of conflict in the evidence, it must be remembered that the appellate court does not sit as a judge to determine the issues of fact upon the credibility of the testimony of the witnesses; and when we are asked to reject evidence upon which the jury acted it is necessary for appellant to show that such

evidence is inherently improbable or that it was incompetent, or for some other reason does not constitute legal evidence upon which the jury was entitled to rely. There is no such showing here. The jury was not bound to disregard the incriminating evidence and to accept the defendant's denial of any wrongdoing.

Appellant next complains of the cross-examination by the district attorney of a witness, Emeline Emens, called by the defense, during which interrogation it was brought out that the witness and appellant, although not married to each other, had been living together, and that she had borne him two children. The following constitutes the cross-examination complained of:

"By Mr. O'Brien (Deputy District Attorney):

"Q. How long have you known Mr. Payton?

"A. I have known Mr. Payton approximately eight years.

"Q. You have lived with him as man and wife for years, haven't you?

"Mr. Oster: That is objected to as not proper cross-examination.

"The Court: It shows interest, although I won't be sure you have some—

"Mr. O'Brien: I certainly, if your Honor please, have been so told or I would not ask that question.

"The Court: All right. You may answer.

"Q. By Mr. O'Brien: Did you understand the question?

"A. I don't know what it was now.

"(The reporter read the last question.)

"A. Is that what,—for a year?

"Q. For any time?

"A. I have.

"Q. As a matter of fact, you have two children by him, haven't you?

"Mr. Oster: I object to that as not proper cross-examination.

"The Court: It shows interest.

"Mr. Oster: I assign the asking of the question as misconduct, and ask your Honor to instruct the jury to disregard it.

"The Court: Denied. She may answer.

"A. I have."

We perceive no error in the trial court's ruling. It is elementary that the state of mind of a witness as to bias, prejudice, interest involved, and hostility or friendship toward parties litigant, are all subjects for investigation in the trial of a case. In the case at bar the inquiry was proper as tending to show that the witness cherished a friendly interest in appellant which would bear upon the question of the credibility of her testimony. (*People* v. *Souleotes*, 27 Cal. App. 288, 289 [149 Pac. 802]; *People* v. *Crandall*, 125 Cal. 129, 136 [57 Pac. 785].) As was said in *People* v. *Peter*, 125 Cal. App. 657, 663 [14 Pac. (2d) 166], where a witness was asked if she and appellant therein had not lived together as husband and wife, "If the witness had lived with appellant in the relationship of husband and wife, this circumstance would, without doubt, be one which the jury could rightly consider as a factor in arriving at the motive of the witness and the weight to be given to her testimony." The cases cited by appellant in support of the general rule that the prosecution may not introduce evidence designed merely to degrade and prejudice the defendant before the jury are not here applicable, for the reason that such cases hold that the admission of such evidence is error only where it bears no materiality to the issues involved in the case. In the matter before us the testimony was admissible because it was pertinent to the question of the interest of the witness in the defendant and the outcome of the trial.

Appellant next assigns as misconduct the action of the district attorney in his argument to the jury when the prosecutor said:

"You will remember that it was on the 12th day of October, 1938, that these two checks came into the possession of Mr. Payton. That, as we all know, was Columbus Day, and the banks were closed. It would appear on that particular date that Mr. Payton at least needed some money, so it was he had this smaller check made so that he could cash it down there at some of the stores. He, of course, did not cash it. He asked Mr. Koopman to go in and cash it for him. I wonder if the reason was that Mr. Payton, who had lived down there for a long time, had not acquired or obtained a bad reputation for himself in connection with these checks—

"Mr. Oster: If your Honor please, I object to that; nothing in the evidence about that, and it is not proper.

"The Court: It is a matter of argument.

"Mr. O'Brien: He told you he was convicted of a crime of issuing checks without sufficient funds, and lived down in that locality for 28 years. It is fair to assume, I would say, from that kind of testimony that everybody in that community knew him, knew that he had put out at least one bad check and been convicted for it. Therefore, it would be far more difficult for him to put over a check than it would be for a man like Ray Koopman apparently who has no bad reputation."

When it is remembered that there is evidence that appellant made out both checks in question and left the names of the payees blank; gave them in that condition to Mr. Koopman to cash instead of cashing them himself, and that he admitted a prior conviction in connection with fictitious checks, we are impressed that the district attorney was well within his rights in addressing the jury as he did. Further, counsel for appellant did not request the trial court to admonish the jury to disregard the remarks in question, but was content to rest upon an objection made on the ground that "nothing in the evidence about that, and it is not proper". In the face of the record before us, defendant having failed to make such a request for an appropriate admonition to the jury, a reversal of the judgment based on such an alleged error under the authorities would be unwarranted. (*People* v. *Chilcott,* 18 Cal. App. (2d) 583 [64 Pac. (2d) 650]; *People* v. *Davidson,* 23 Cal. App. (2d) 116, 119 [72 Pac. (2d) 233].) We find no impropriety in the argument of the district attorney that would stigmatize it as improper, and even though the remarks of the prosecutor be deemed improper, they were certainly not of that extreme character that the error could not be cured by a timely admonition or instruction to the jury, neither of which was requested.

 Appellant complains of an instruction given by the court relating to false pretenses. That portion of the instruction to which objection is made reads as follows: "The Court instructs the jury that if you believe from the evidence beyond a reasonable doubt that . . . the defendant knowingly and designedly made the representations and pretenses testified to by the witness, A. Zualet, or any of said

representations or pretenses, . . . '' Criticism of the foregoing instruction is thus stated by appellant in his brief:

''This instruction assumes as a fact that the witness A. Zualet testified to representations and pretenses knowingly and designedly made by the defendant. It charges the jury on a matter of fact and is an invasion of the right of the jury to determine whether or not the witness A. Zualet testified to representations and pretenses made by the defendant. . . .

''Further objection to the above instruction is made by appellant in that this is the only instruction which directs a conviction if the jury find the facts therein to be true beyond a reasonable doubt. Nowhere in the instruction are the jury told that there must be a felonious intent or felonious taking.''

The first part of appellant's criticism cannot be sustained because it is at once apparent that the instruction does not assume that the complaining witness Zualet testified that representations and pretenses were knowingly and designedly made by defendant, but clearly and unequivocally advises the jury that *if they believed* that the defendant made the representations testified to by the witness Zualet, etc. That Zualet did testify to the making of certain representations by defendant is unquestioned. In fact, appellant admitted making the representations attributed to him by Zualet. ▇

Referring to the last part of appellant's criticism, we find no merit therein. The alleged infirmity complained of was fully cured by some nine instructions wherein the jury was directly and repeatedly instructed upon the ''intent to defraud'' which must be established to sustain a conviction.

▇ Finally, appellant charges that the judgment is void because the amended information ''was filed without an order of the court''. At the time of the filing of the amended information, which was on the day the case was called for trial, the record discloses the following proceedings as having taken place:

''Mr. O'Brien (Deputy District Attorney): If your Honor please, there has been prepared an amended information upon which the defendant has not been arraigned, I believe.

''The Court: You better arraign him.

"Mr. Oster: May we approach the bench? (Thereupon the following occurred at the bench outside of the hearing of prospective jurors in the room) :

"Mr. O'Brien: It just charges a prior, that is all. Here it is, right here (indicating).

"Mr. Oster: It has not been filed yet, has it?

"Mr. O'Brien: Here is your copy (handing document to Mr. Oster).

"Mr. O'Brien: Frank C. Payton, is that your true name?

"The Defendant: Yes.

"Mr. O'Brien: You are charged in an amended information filed by the District Attorney of this county, in Case No. 74,574 *filed with the consent of the Court,* with the crime of grand theft, it having been committed on or about the 12th day of October— (Italics added.)

"Mr. Oster: We waive the further reading.

"Mr. O'Brien: To that amended information, how do you now plead, guilty or not guilty?

"Mr. Oster: We plead not guilty, and admit the prior.

"Mr. O'Brien: There is the additional allegation, that before the facts set forth in this amended information, on the 14th day of August, 1934, in the Superior Court of the State of California, in and for the County of Los Angeles, you were convicted of issuing checks without sufficient funds, a felony. Do you admit or deny that prior?

"Mr. Oster: We admit it.

"The Court (addressing the clerk) : When you read the information, omit the prior. Call the jury."

A mere reading of the foregoing at once indicates from the statement of the district attorney that the amended information in question was "filed with the consent of the court". The record also discloses that it was "filed in open Superior Court of the County of Los Angeles, State of California, on motion of the District Attorney of said Los Angeles County". The amended information did not in any manner change the substantive charge against appellant, but simply alleged his prior conviction of a felony. By its terms section 969a of the Penal Code makes the filing of such an amendment mandatory; and where, as here, the district attorney asserted that such amended information was filed with the consent of the court and defendant made no objection to either the filing of the same or his arraignment thereon,

he cannot for the first time raise the point on appeal that the pleading was filed without an order of court. Furthermore, the court had the right to permit the filing of the amended information; indeed, it was plainly the duty of the court so to do (Pen. Code, sec. 969a) ; and such action of the court would not have been subject to objection, if any had been made. An additional reason why appellant should not now be heard to complain is that he acquiesced in the course that was pursued with reference to the filing of such amended information.

Appellant having been fairly tried and justly convicted, the judgment appealed from is affirmed.

York, P. J., and Doran, J., concurred.

A petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on January 8, 1940.