[Crim. No. 3596. Second Dist., Div. Three. June 7, 1943.]

THE PEOPLE, Respondent, v. GEORGE H. BEILFUSS, Appellant.

John S. Cooper for Appellant.

Earl Warren, Attorney General, Frank Richards, Deputy Attorney General, John F. Dockweiler, District Attorney, and Jere T. Sullivan and Marcus R. Brandler, Deputies District Attorney, for Respondent.

SHAW, J. pro tem.—The defendant was charged in each of twelve counts of an information with grand theft. He was tried without a jury and convicted on all counts. Later his motion for a new trial was granted as to counts II, VI and XI, and those counts were dismissed. He appeals from the judgments entered on the remaining counts and from an order denying his motion for a new trial.

Each count charges a theft of money from the same persons, Miss Caroline A. Ingersoll and Miss Frances L. Proctor, the amounts and dates being different. The two ladies mentioned were past eighty years of age and had lived together for forty years or more, at the time of their dealings with defendant from which these charges arose. Miss Proctor died before the trial and the testimony in support of the charges

was given by Miss Ingersoll only, insofar as it relates to the taking of the money and the statements and representations made by the defendant in connection therewith. Defendant's principal point on this appeal is that the evidence is insufficient to support the convictions. He also contends that there was a variance between the pleading and the proof as to the identity of the persons defrauded, that evidence obtained by a wrongful search of his office and seizure of articles found therein was improperly admitted in evidence and that his motion for a return of this evidence and his motion for a continuance were wrongly denied. We will discuss the contentions last mentioned first.

■ The defendant's point relating to the variance is that in all cases the theft is alleged to have been from two persons, Miss Ingersoll and Miss Proctor, while in some of the cases the testimony shows that the money was delivered to defendant by one or the other of them only. To this argument a sufficient answer is found in this provision of section 956 of the Penal Code: ''When an offense involves the commission of . . . a private injury, and is described with sufficient certainty in other respects to identify the act, an erroneous allegation as to the person injured . . . is not material.'' (*People* v. *Foster*, (1926) 198 Cal. 112, 122 [243 P. 667]; *People* v. *Cloud*, (1929) 100 Cal.App. 792, 794 [281 P. 79].) Moreover, there is proof of the allegations as made, for it appears from the testimony of Miss Ingersoll that she and Miss Proctor had an arrangement by which all these transactions were for their joint account, no matter which one paid out the money in the first place, and they settled the disbursements between themselves from time to time.

■ It appears from a showing made by defendant in the trial court that at the time of his original arrest on the charges involved in this case he was taken from his office, where the arrest was made, and that an investigator from the district attorney's office, who accompanied the arresting officer, but had no search warrant, remained behind after defendant's removal, searched through defendant's papers and removed a part of them. Defendant then began in the Los Angeles Municipal Court an action against the district attorney to recover possession of these papers, obtained a speedy trial of that action, and at the commencement of the trial of the case at bar had just received word that the municipal court

case had been decided against him, but no judgment had then been entered. He then made a motion for a continuance of the trial of this criminal case to enable him to appeal from the judgment in the municipal court case and have the appeal heard, in the hope of obtaining a reversal of the then as yet unentered judgment. Defendant also presented a petition to the trial court in this case for the return to him of the papers so taken from him, which was denied, the court rejecting his offer to prove the facts above stated. When such papers were offered in evidence he objected to them on the ground that they had been obtained by an unlawful search and seizure, but his objection was overruled and they were received in evidence. His argument here on these matters amounts to a request that we overrule or ignore the decision in *People* v. *Mayen,* (1922) 188 Cal. 237 [205 P. 435, 24 A.L.R. 1383], where it was held that upon an offer of evidence the court will not inquire into the manner in which that evidence was obtained or exclude it because it was obtained by means of an unlawful search and seizure, and that, while the defendant in such a case has a right to recover possession of papers wrongfully taken, his proceedings to do so are no proper part of the trial of the criminal case against him and the decision thereon cannot be reviewed on appeal from the judgment in the criminal case. This decision was considered and reaffirmed in *People* v. *Gonzales,* (1942) 20 Cal.2d 165, 168 [124 P.2d 44], and is immune from attack in this court. Neither of these cases dealt with a motion for a continuance, such as we have here, but we think that, on the showing here made, the court did not abuse its discretion in denying the motion.

Defendant's contention on the evidence is that, if any offenses are shown, they are what would formerly have been designated as the obtaining of money by false pretenses, and that the testimony of Miss Ingersoll is not corroborated. Since the 1927 amendment of section 484 of the Penal Code, this sort of crime is now included in the definition of theft. But it still remains subject to the provisions of section 1110 of the Penal Code that "the defendant cannot be convicted if the false pretense was expressed in language unaccompanied by a false token or writing, unless the pretense, or some note or memorandum thereof is in writing, subscribed by or in the handwriting of the defendant, or unless the pretense is proven by the testimony of two witnesses, or that of one

witness and corroborating circumstances. . . ." (*People* v. *Fawver*, (1938) 29 Cal.App.2d Supp. 775, 777 [77 P.2d 325], and cases there cited.) As to some of the counts the People contend that the evidence satisfies the requirements of this section. ▆ As to all but count X, they further contend that the evidence shows a case of larceny by trick and device. While such an offense is within the statutory definition of theft, above mentioned, it is not subject to the provisions of section 1110. (*People* v. *Fawver, supra.*)

▆ The distinctions between the offenses of obtaining money by false pretenses and larceny by trick and device were discussed in *People* v. *Delbos*, (1905) 146 Cal. 734, 736 [81 P. 131], where the court quoted the following statement from a text book, italicising it as we do: "In larceny, the owner of the thing has no intention to part with his property therein *to the person taking it,* although he may intend to part with the possession. In false pretenses the owner does intend to part with his property in the money or chattel, but it is obtained from him by fraud." The court, after quoting other authorities of which it said, "the meaning is the same," proceeded: "These authors are here speaking of the intention of the owner with respect to the relation which the person then receiving the goods shall bear to them; that is, the owner's intention as to the effect which the delivery of the possession to the defendant shall have on the title. If such delivery is intended to transfer the title, absolutely, there is no larceny, for the goods are then no longer his property, and a subsequent theft of them would be a theft of the goods of the person to whom title was thus transferred, and furthermore the defendant would then be invested with the title himself, and could not be guilty of stealing that which is his own." In *People* v. *Fawver, supra,* 29 Cal.App.2d Supp. 775, 779-780 [77 P.2d 325], this subject was further discussed and the authorities on the subject were reviewed in some detail. We adopt what was there said as expressing our views. After citing *People* v. *Delbos, supra,* and many other cases to the same point, the court in *People* v. *Fawver* said: "The passing of title referred to in the rule is the complete title to the property; although the defendant obtains at the time possession is delivered to him some special interest or right in money or other property delivered, yet if the victim retains an interest therein, there may be a larceny. Also, if

the victim intends title to pass at some time later than the delivery, or upon the fulfillment of some condition not then performed, there may be a larceny. A still more common case is that the victim delivers money or property to the defendant as a loan to enable him to carry out some special plan, or upon some trust, or for some special purpose, as, to invest it, or to buy property with it. In all these cases the title does not pass to defendant on delivery to him, and if he then takes what is delivered to him with the intention of appropriating it to his own use, there is a larceny. But this case presents no such facts. Here the money was delivered to defendant, according to the record, 'in advance, as payment on these fittings.' Tinkle had refused to make a loan to defendant or to finance him in the making of molds for these fittings, but on being told that defendant had made the fittings he bought some and *paid* a part of the price in advance. There was no loan, no plan or purpose in the mind of Tinkle to which he expected the money to be applied. A payment passes to the payee a present and complete title to the property given in payment. (See 48 C.J. 631.) If the consideration for which a payment is made is not forthcoming, the payor may rescind and recover what he paid, but that possibility does not alter the original effect of the payment as a transfer of title." To same effect see *People* v. *Barnett*, (1939) 31 Cal.App.2d 173, 175 [88 P.2d 172].

Bearing the foregoing distinctions in mind, we address ourselves to a consideration of the evidence relating to the individual counts.

## COUNT I.

 This count charges a theft of $300 on May 28, 1940. The facts appearing in regard to this are, briefly, that the defendant informed Miss Proctor and Miss Ingersoll—whom we shall hereinafter refer to as "the victims" when it is necessary to mention them conjointly—that an option which they had given to one Van Stone on some New Mexico land had been bought by another man, and that this transferee claimed he had been defrauded and wanted $300 to reimburse him for what he had paid for the option or otherwise he might sue the victims. Defendant further said he had paid $300 to this transferee to get the option and had then destroyed it and he demanded of the victims repayment of this $300. They paid him $300 in response to this demand,

and this payment is the subject of count I. We find no direct evidence of the falsity of the statements thus made by defendant to the victims as a reason for the payment of the $300 to him by them, although the very nature of those statements is such as to cause anyone less trustful and confiding than the victims appear to have been to question them. But however much we may doubt the reality of the transaction thus narrated to the victims, and even assuming its nonexistence, we are unable to see in the evidence anything but the obtaining of money by false pretenses. The victims paid the money to defendant to reimburse him for an expenditure he claimed already to have made in their behalf; there was no condition attached to the payment, nothing more for defendant to do in the matter, no plan or purpose in the minds of the victims to which the money was to be applied. As far as their intentions were concerned, the transaction was closed by the payment. The payment, though made for a nonexisting consideration, was as effective to pass a present and complete title to the money as was the payment for nonexisting pipe fittings in *People* v. *Fawver, supra,* (1938) 29 Cal.App.2d Supp. 775 [77 P.2d 325]. (See, also, *People* v. *Shearer,* (1927) 83 Cal.App. 321, 331, 332 [256 P. 611].)

The money involved in this count was paid to defendant by a check, which was introduced in evidence. The People argue that this is sufficient to satisfy section 1110, Penal Code, as a false token or writing. The cases contain no clear definitions of these terms, but to bring an object within either, there must, of necessity, be something false about it. A writing which is genuine and contains no false statements of fact cannot be a "false token or writing." The check is, therefore, excluded from this category. (*People* v. *Carter,* (1933) 131 Cal.App. 177, 184 [21 P.2d 129] ; see, also, *People* v. *Wynn,* (1941) 44 Cal.App.2d 723, 728 [112 P.2d 979] ; *People* v. *Payton,* (1939) 36 Cal.App.2d 41, 53 [96 P.2d 991] ; *People* v. *Pearson,* (1924) 69 Cal.App. 524, 531 [231 P. 612].) *People* v. *Harrman,* (1940) 40 Cal.App.2d 487, 492 [104 P.2d 1063], cited by respondent, does not hold to the contrary, for it specifically declares that the writing there considered was not used "for the purpose suggested in section 1110."

It is also argued that there is sufficient corroboration of Miss Ingersoll. But the corroboration required by section

1110 is of the making of the pretense. (*People* v. *Walker*, (1924) 69 Cal.App. 475, 496 [231 P. 572].) We find no corroboration going to this subject.

## Count III.

Counts III, IV, V, VII, VIII, IX and X revolve about defendant's dealings with the victims in regard to some land In Fresno County. ■ About the latter part of September or the first part of October, 1940, defendant said to them that he had discovered some valuable oil land in Fresno County which belonged to them but was incumbered by taxes and assessments amounting to $6,000 or $7,000, and that it was so valuable they ought to try to get it back; and he offered to attend to it for them. He at first said there were 3¼ acres of this land, but later said there were 4¼ acres. They had not heard of this land before, and said they could not put up all the money necessary but would allow him "to go after it if he was willing to put up the extra money that was necessary." About the middle of November, 1940, defendant inquired of Murray Blank, who had a real estate subdivision in Fresno County, if any of that acreage was available, and on November 16, 1940, defendant paid Blank $320 and for that sum received a deed conveying to him 4¼ acres of land in Fresno County. Blank had owned this land for about a year before defendant bought it, and testified that he had paid the taxes on it, that they amounted to thirty to thirty-five cents per acre, and that there were no back taxes on it when he sold it to defendant. Defendant then executed two deeds, dated November 27, 1940, by which he conveyed to each of the victims approximately half in area of the land he had thus acquired from Blank, had these deeds recorded and then gave them to the victims, saying that he thought it would be better to get the Fresno County land in his own name and then transfer it to them.

About October 8, 1940, Miss Ingersoll gave defendant $1,000 in the form of a cashier's check which she obtained from a bank by putting up three bonds as security. This is the subject matter of count III. The conversation at the time she gave him this check was "that he was to use it in paying those taxes. Q. Who said that? A. Well, that is what he claimed I should pay him, he wanted to use that much money at the time. Q. On this Fresno County land? A. Yes sir, it was to go toward the taxes, toward the redemption of the land

. . . it was an advance payment on what he would have to pay toward redeeming the Fresno land." This check was cashed by defendant. This evidence is sufficient to show a larceny by trick and device, under the rules above stated. Miss Ingersoll did not intend to pass to defendant an absolute, or indeed any, title to the money so given to him; there was a special plan or purpose in her mind to which she expected the money to be applied, that is, the redemption of this Fresno County land, which she supposed the victims owned, from taxes. She was tricked into making this payment in two ways; first, there was then no land owned by them, and second, the land which defendant later proffered as theirs was subject to no back taxes. Plainly the defendant had, at the time the money was delivered to him, the intention of appropriating it to his own use, and the case is one of larceny rather than false pretenses.

## COUNT IV.

On November 14, 1940, Miss Ingersoll, according to her testimony, turned over to defendant two bonds for which he told her he got $1,385. Other evidence shows that the next day after these bonds were delivered to defendant they were pledged to a bank to secure his note, and that they were later sold for $1,395.62, defendant's note was paid with part of the proceeds and the balance was turned over to him. Just before testifying to the delivery of these bonds, Miss Ingersoll testified: "Q. By MR. HINSHAW: Now, after you had given Mr. Beilfuss this $1000.00, [the subject of Count III] did you have any further conversation with him about this Fresno land at any other date? A. Yes, sir, he would come every little while and want some more money. Q. And did he tell you what he wanted the money for? A. Well, it was to pay these men that had paid the taxes, the redemption. Q. Did he ever tell you how much the total amount was? A. He did at the last, yes. It was, in addition to what we had paid him, he claimed that he had furnished six thousand and some odd dollars. I can't remember how much." Just after testifying to the delivery of the bonds, she further testified: "Q. What were the circumstances of your turning those bonds over to Mr. Beilfuss? A. Well, he claimed that we owed him some money, he had to use this money to pay on the taxes. . . . I asked him for the confirmation slips. He didn't tell me where he sold them, but he kept saying he

would bring those confirmation slips, but he didn't do it." This testimony is somewhat ambiguous, but it is capable of the construction, which the trial court evidently put upon it, that these bonds were delivered to defendant in trust to use the proceeds in paying the taxes on the Fresno land. We must apply the same rules here as in case of count III already discussed and reach the same conclusion.

## Count V.

On November 23, 1940, Miss Ingersoll delivered some stock to defendant, which he sold for $723.94, keeping the money. The general statement already quoted under count IV that "he would come every little while and want some more money . . . to pay these men that had paid the taxes, the redemption" is applicable to this transaction, and leads to the same conclusion announced on count IV.

## Count VII.

On January 2, 1941, Miss Proctor gave defendant a check for $350. The testimony regarding this is: "he claimed that she owed it, or something. I don't remember about that. . . . Q. . . . what was said about that? A. Well, that is 350 that was still due him on the land. . . . It was the Fresno land . . . that we had cleared up all the other expenses except that $350.00, and that was for his expenses in some phase of it—he had it itemized." We can make of this nothing more than an absolute payment to defendant, intended by the victims to reimburse him for money they supposed he had previously paid out in their behalf. This count is the same as count I in principle and the same conclusion must be reached regarding it.

## Count VIII.

After the victims received the deeds to the Fresno County land, they executed an option on it to a man named Evans, who took the option away with him. Miss Ingersoll had previously talked with defendant by telephone regarding the matter and he had said that Evans would bring out an option prepared by defendant. A little later defendant came to see them and said Evans had substituted another option for the one drawn by defendant and changed the number of acres called for by it to 14½ instead of 4½ that they owned and had then sold it to two men for $18,500, and that these men demanded that the victims either convey 14½ acres or

return to the men the $18,500 paid by them for the option, and threatened to sue the victims if this was not done. The victims naturally did not know what to do in this situation. They told defendant they could not pay $18,500, and he then came forward with a solution; he said, according to Miss Ingersoll, that "if we could furnish $3,500 that he could raise $15,000 and he felt somewhat responsible . . . and that he wanted to try to help us all that he could . . . there was nothing to do but try to pay that $18,500." They gave him six bonds as collateral to furnish the $3,500, Miss Proctor furnishing four and Miss Ingersoll two. Miss Ingersoll testified regarding this matter, "we simply delivered our bonds as collateral for something that he would borrow at the bank, but he said he would try to keep those bonds simply as collateral so that they could be returned to us later, instead of sold." Defendant borrowed money on the bonds and then sold them and realized from them, net after furnishing Miss Ingersoll $1,000 to pay off a lien on her bonds, a sum in excess of $2,900 (stated in this count to be $2,921.51). No question is raised about the sufficiency of the evidence to show the fictitious nature of the claim which, according to the defendant, was being asserted against the victims and was to be settled by means of the dealings involved in this count, but we have examined it and find it sufficient on this point. Here again there is evidence that the victims did not intend to pass the complete title to these bonds or their proceeds to the defendant, but intended them to be applied to a special purpose, and that defendant intended, when he received them, to appropriate them to his own use. A larceny by trick and device sufficiently appears.

Defendant argues, in connection with this count, as well as the others, that Miss Proctor's state of mind cannot be shown by the testimony of Miss Ingersoll and that for this reason the evidence is insufficient. While the intent of the victim is one of the matters to be proved in a case of this kind, and while direct testimony of such victim is receivable in proof of that intent, yet such testimony is not the only possible proof of intent, but in this, as in other cases, intent may be shown circumstantially. Here Miss Ingersoll herself delivered a part of the property obtained by defendant, and she could directly testify to her own intent. She was present when Miss Proctor delivered the property obtained from her, and she could and did testify to the circumstances attending that

transaction. Her testimony was sufficient to support the jury's implied finding regarding Miss Proctor's intent. In case of all the other counts which we affirm, Miss Ingersoll herself made all the payments, and her intent, to which she testified, was the intent to be considered, whether she was acting for herself alone or also for Miss Proctor. In the latter case Miss Ingersoll's intent would be imputed to Miss Proctor.

### Count IX.

 At the time the victims made the payment discussed under count VIII they gave defendant a promissory note for $15,000 for the money he was supposed to be advancing. On February 14, 1941, Miss Ingersoll paid the defendant $500, "on what he said we owed him." This is another case of an ordinary payment and the offense proved is the obtaining of money by false pretenses. The People urgently contend that because this payment was made for a fictitious consideration, a case of larceny by trick and device is shown. We have already stated our reasons for disagreeing with this contention.

 However, the People also contend that in this transaction there was a false token or writing accompanying the false pretense and we think this contention must be sustained. This payment grew out of the transaction we have described under count VIII. In the course of that transaction, on February 4, 1941, when the $15,000 note was signed, and before the payment involved in this count was made, defendant handed to Miss Ingersoll a writing which purported to be signed by the two men who were making the claim against the victims, and to release the victims from the claim supposed to be so asserted. Since the evidence shows that this whole claim was a fiction, and even that there were no such persons known to defendant as those named by him as claimants, this paper is undoubtedly a false token. (*People* v. *Wynn, supra,* (1941) 44 Cal.App.2d 723, 728; *People* v. *Payton, supra,* (1939) 36 Cal.App.2d 41, 53; *People* v. *Pearson, supra,* (1924) 69 Cal.App. 524, 531; *People* v. *Fleshman,* (1915) 26 Cal.App. 788 [148 P. 805].) This release, after it was handed to Miss Ingersoll, was copied by her, and then handed back to defendant by her. She testified to the correctness of her copy and it was admitted in evidence.

 The proof of this false token was made only by the testimony of Miss Ingersoll herself, but this fact does not prevent

it from satisfying the purpose of section 1110 of the Penal Code. In *People* v. *Martin*, (1894) 102 Cal. 558, 564 [36 P. 952], the Supreme Court raised, without deciding, the question whether corroborating circumstances in regard to a false pretense may be shown by the testimony of the same witness who testified directly to the false pretense. We need not decide it here, for section 1110 requires corroboration only if the false pretense is "unaccompanied by a false token or writing." Under this provision the witness who testifies to the pretense may also testify to the false token or writing accompanying it and needs no corroboration if he does so. Here, secondary evidence of the contents of the release was proper because it was traced back into the possession of the defendant. (*People* v. *Powell*, (1925) 71 Cal.App. 500, 515 [236 P.311].)

## COUNT X.

On April 3, 1941, Miss Ingersoll gave defendant $890.55 by endorsing to him a check for that amount payable to her. She had no recollection of her conversation with him at the time. The endorsement was in the ordinary form which transfers title, and we cannot regard the evidence on this count as sufficient to show anything other than such a transfer. No conditions or qualifications to the transfer appear and a case of larceny is not made out.

## COUNT XII.

About July 10, 1941, defendant stated to the victims that he had run across some property that belonged to Evans—the same man who had obtained from them the option above mentioned in the discussion of count VIII—that he could get a lien on and that he had to supply some money to somebody who had investigated the matter and that if he could get hold of that land he could sell it for a large amount of money, and that this land was very valuable. On the same day Miss Proctor sold some shares of *common stock* of Pacific Southern Investors for $438.78 and caused the proceeds to be paid to defendant. She had previously handed the stock to defendant for delivery to the brokers who made the sale and at that time defendant gave her a receipt for this stock. While the date of this transaction differs from that alleged in count XII by four days, the amount is the same. The People assert and the defendant concedes that count XII is

aimed at this transaction; hence we so regard it. Miss Ingersoll testified that it was "upon the strength of" the above mentioned statement of defendant and *her* belief in it "that the *bonds* were turned over, of the Pacific Southern Investors." The defendant admits receiving and selling the *stock* described in his receipt, but says the proceeds were applied to the price of land sold by him to the victims. This evidence fails to show that the cause inducing Miss Proctor to turn over to defendant the property, the proceeds of which he ultimately received, was his statements above mentioned. Miss Ingersoll testified only to *bonds* turned over by reason of such representations. The property sold was *stock* of the same corporation. Hence we are left in the dark as to the nature of the transaction by which defendant got the proceeds of the *stock* and cannot say that a crime was committed by defendant. For this reason we do not consider the People's contention that defendant's receipt was a false token within the meaning of section 1110 of the Penal Code. If the differing descriptions refer to the same property, that can be shown on another trial. It cannot be assumed, without evidence, that such was the fact.

The defendant testified that all his dealings with the victims were mere sales of land or interests therein to them and the payments they made to him were on account of the prices due him on such sales, and denied Miss Ingersoll's testimony of his statements so far as it showed a different state of facts. But this merely raised a conflict in the evidence and, on familiar rules, the trial court's decision in that matter is binding upon us.

The judgments on counts III, IV, V, VIII, and IX, and the order denying a new trial on those counts are affirmed. The judgments on counts I, VII, X and XII, and the order denying a new trial on those counts are reversed and the cause is remanded for a new trial on those counts.

Shinn, Acting P. J., and Wood, (Parker), J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied July 1, 1943. Carter, J., voted for a hearing. Schauer, J., did not participate therein.