[Crim. No. 2975. In Bank.—July 2, 1927.]

THE PEOPLE, etc., Respondent, v. THOMAS M. HENNESSEY and HARRY D. HIBBS, Appellants.

[1] Criminal Law—Verdict—Appeal.—In a criminal case, the findings of the jury upon disputable questions of fact, if supported by direct evidence or inferences or both, must be given full faith and credit; and it is only where, as a matter of law, there is no legal evidence supporting the charge that a reviewing court may disturb a verdict.

[2] Id.—Grand Larceny—Sufficiency of Evidence.—In this prosecution for grand larceny it is held that the evidence overwhelmingly establishes the fraudulent purposes of the defendants.

[3] Id. — Obtaining Money by Trick and Device. — In such a case, where the evidence shows a preconceived design on the part of the defendants to appropriate moneys to their own use in fur-

1.  See 8 Cal. Jur. 583.
3.  See 15 Cal. Jur. 908.

therance of a plan and system at the time they obtained possession thereof, accomplished by means of trick and device, their acts amounted to larceny.

[4] ID.—FALSE REPRESENTATIONS — GENERAL PLAN — DISTINCT REPRESENTATIONS.—Where a false representation is made under a general plan and purpose to obtain property, it is not necessary to show a distinct representation was made in each following act, if it appears or can fairly be inferred that the first false representation was still operating upon and influencing the mind of the person imposed upon. It is only in those cases where it may be fairly presumed that the first false representation has ceased to operate upon the mind of the person thus imposed upon or where there is some evidence tending to show that the first false representation had been removed that full proof of the representation must again be made.

[5] ID. — EVIDENCE—INTENT—SCIENTER—OTHER OFFENSES.—Other offenses, similar to the one charged in the indictment, are provable against the defendant to show scienter in cases where the criminal intent is the gravamen of the charge, as in cases of fraud.

[6] ID.—TRANSFER OF POSSESSION OF PROPERTY—TITLE.—Where the owners of property surrendered possession thereof to the defendants with the understanding that it was to be used in the accomplishment of a definite object by the latter, and it was not so used, the title to the property did not pass; and the defendants having been convicted of larceny, the implied finding as to their intent cannot be disturbed on appeal.

[7] ID.—EVIDENCE—NONEXISTENCE OF CONTRACT—PROOF.—In such a case, where the defendants obtained possession of money upon the representation that they had a contract with a certain corporation, there was no error in permitting the treasurer and assistant secretary of the corporation to testify that he had made an examination of the corporation's records for the purpose of determining whether or not it had made or had in its possession a contract with the defendants or either of them,

---

5. Evidence of other crimes in prosecution for larceny, notes, 62 L. R. A. 231, 281, 322; 43 L. R. A. (N. S.) 776. See, also, 15 Cal. Jur. 937; 17 R. C. L. 75. Admissibility of evidence of other crimes in criminal prosecution, notes, 44 Am. Rep. 299; 105 Am. St. Rep. 976. See, also, 8 R. C. L. 202.

6. Larceny by obtaining possession of money by trick, note, 1 L. R. A. (N. S.) 862. See, also, 15 Cal. Jur. 899, 905; 17 R. C. L. 13. Obtaining possession of property by trick or fraud with intent to steal, note, 8 Ann. Cas. 287. See, also, 15 Cal. Jur. 905; 17 R. C. L. 14. Appropriation of property after obtaining possession by fraud as larceny, note, 26 A. L. R. 381.

for the purpose of showing that no such contract or reference thereto was to be found in its possession or was disclosed by its records.

---

(1) 17 C. J., p. 223, n. 42 New, p. 256, n. 62.   (2) 25 C. J., p. 650, n. 42, p. 652, n. 50. (3) 25 C. J., p. 653, n. 70, p. 657, n. 25. (4) 25 C. J., p. 651, n. 46.   (5) 16 C. J., p. 589, n. 18, p. 597, n. 76. (6) 17 C. J., p. 255, n. 53.   (7) 16 C. J., p. 615, n. 50 New; 17 C. J., p. 254, n. 35.

APPEAL from a judgment of the Superior Court of Los Angeles County and from an order denying a new trial. Edwin F. Hahn, Judge. Affirmed.

The facts are stated in the opinion of the court.

Paul W. Schenck, Leo V. Silverstein and Homer C. Mills for Appellants.

U. S. Webb, Attorney-General, John W. Maltman, Deputy Attorney-General, and Warner I. Praul for Respondent.

SEAWELL, J.—By the indictment filed against them the defendants were jointly charged under forty-six counts with the commission of a like number of separate and distinct crimes of grand larceny, aggregating $158,000 in money or its equivalent. Thirteen of said counts were withdrawn from the jury's consideration. As to the remaining counts defendants were convicted under thirty and acquitted under three. The total amount of money set out in the several counts upon which convictions were had is $87,000. The judgment pronounced by the court under each count upon which a conviction was obtained provides that the sentences shall run consecutively.

Both defendants have appealed from the judgments of conviction and from the order denying the motion of each for a new trial.

The most forceful argument pressed by appellants is that granting for the purpose of argument, but by no means conceding as an established fact, that the evidence is sufficient to establish the commission of some crime—obtaining money or property by false pretenses, as an example— against the defendants, under no theory or view of the law can it be said that the acts as related by the evidence con-

stitute the crime of larceny as defined by section 484 of the Penal Code, or as that section has been construed and applied in cases where the possession of the personal property has been obtained in the manner shown by the evidence in the instant case.

The judgments of conviction were affirmed by the district court of appeal, second district, division two, upon a very thorough and elaborate discussion of the law and review of the facts. Thereafter a petition presented to this court for a hearing was ordered granted and the cause is before us in compliance with said order.

The record in the case is extensive. We have read the voluminous transcript of testimony and have given considerable time and care in examination and consideration of the briefs and the several contentions made by counsel as to whether the evidence adduced at the trial is legally sufficient to sustain the convictions of grand larceny obtained under the various counts of the indictment upon the theory that the possession of said property was obtained by resort to fraud, trick, or device and that possession so acquired, as declared by much respectable authority, is larcenously acquired. [1] The findings of a jury upon disputable questions of fact if supported by direct evidence or inferences or both must be given full faith and credit. It is only where, as a matter of law, there is no legal evidence supporting the charge that a reviewing court may disturb a verdict. The rule, upon an appeal in a criminal case, is that the court must assume in favor of the verdict the existence of every fact which the jury could have reasonably deduced from the evidence and then determine whether or not the guilt of the defendant is deducible therefrom. The question for the court to pass upon is whether there were facts before the jury to justify the inference of guilt. (*People v. Tom Woo*, 181 Cal. 315 [184 Pac. 389].)

The evidence in this case discloses an exhibition of imperturbable credulity on the part of the persons who parted with their money and property that almost passes human understanding. From the record it appears that defendant Thomas M. Hennessey was but slightly known in the city of Los Angeles. Although Harry D. Hibbs, the other defendant, had made the city of Los Angeles his place of residence and headquarters for a number of years, it would

seem that he was not widely known in the community. Neither of said defendants was at all prominent in financial or business circles, nor does it appear from the record of the transactions that either was associated or connected with any person or persons known as organizers of industrial or commercial enterprises. Nevertheless, they were able, by resorting to thinly clad deception, to interest a number of persons prominent locally in business and financial affairs in a colossal venture that would have taxed, if not staggered, the nation's best financial geniuses to have financed, organized, and carried forward to completion. The purported plan or enterprise was to consolidate or bring into a merger system a number of the important railroads of the country and their subsidiary lines, extending from the Atlantic to the Pacific Coast, and certain other lines which extended into the southern, gulf and southwestern states. The railroads which were represented by the defendants as being included in the merger scheme were the Missouri Pacific, Western Pacific, Iron Mountain, International and Great Northern, Texas and Pacific, Denver and Rio Grande, St. Louis Southwestern, Rock Island, Cotton Belt Lines, New York Central, Gulf Belt Lines, and other lines not important here except possibly to illustrate the magnitude of the undertaking and the methods adopted by the defendants in accounting for and lending plausibility to the existence of the contract which defendants fraudulently represented as having been executed and then existing and which, if genuine, would have richly inured to their benefit. The question vital to the maintenance of the prosecution is whether or not the representations of the defendants as to the existence of the commission contract were false. In determining this issue the jury was authorized to resort to a consideration of the whole case as presented by the evidence. The genuineness of the contract is inseparably connected with other features of the case which will later receive the attention of the court. The scheme which furnishes the background of the prosecution, so far as the counts of the indictment disclose, was first put forward in 1922. From that time forward to the month in which the defendants were indicted— March 28, 1925—Hibbs spent most of his time at Los Angeles actively inducing persons to invest in the scheme, while Hennessey, supposedly, was engaged in large eastern

commercial centers promoting and bringing to a close the consolidation or merger plan. He frequently visited Los Angeles to stimulate interest in the project and quiet the unrest that occasionally developed by reason of delays in consummating the deal. He frequently reported to the investors that satisfactory progress was being made at the eastern end of the line and explained the difficulties that had caused delay, which were usually characterized as minor matters of detail, and gave full assurances that every obstacle had finally been removed and it was but a matter of a few days when all the investors would receive their money increased at the ratio of ten—and, in some instances, fifteen and twenty dollars—for one.

The scheme unfolded by Hibbs and Hennessey to the prospective investors, and doubtless by them communicated to others, was represented to have had its origin several years prior to the year 1922 with a group of capitalists who had subscribed $50,000,000 to establish a cereal refining plant at San Diego, California, which was to be operated in competition with the Corn Products Refinery Company, a middle western concern. As the story was told by them, the cereal refining plant project was abandoned and railroads which had passed or were likely to pass into the hands of receivers throughout the country attracted the attention of said group of financiers and they conceived the plan of transferring their subscriptions and activities to purchasing such railroads and consolidating or merging them into groups, a movement that was then receiving the favorable consideration of the President of the United States, the Interstate Commerce Commission, the Congress of the United States, and the public press generally by reason of the disturbing conditions that followed the taking over of the railroads during the World War. A system of consolidation or merger that was receiving practically unanimous approval was the one formulated and promulgated by Professor Ripley of Harvard College. The interest of the government in the railroad situation and its disposition to aid in the matter was well known to the public and was used by the defendants to give their project a ''goodly appearance.'' Hibbs gave out the word that the $50,000,000 that had been subscribed to finance the cereal refining project had been diverted to the purchase of the Western Pacific

Railway, with Hennessey and himself as brokers in the transaction. It was represented that the Western Pacific had been purchased and it, with the acquisition of the Denver and Rio Grande, which was in litigation and was to form a part of the merger group, would give the Missouri Pacific a coast terminal. It was further represented and reported by the defendants to the persons alleged herein as having been defrauded, and who will hereafter be referred to as the "investors," that said group of capitalists had entered into a gentlemen's agreement to raise $808,000,000 to be used in the purchase of railroads that had become bankrupt as they were offered for sale and also to acquire control of roads by the purchase of stock and bonds, and that the men who furnished the money on the gentlemen's contract to purchase and who did purchase said railroads were required by the government at the time it took over the railroads to form a corporation that the government might have a definite entity to deal with. Both Hennessey and Hibbs separately and together stated to said investors upon a number of occasions that said group of financiers behind the merger project had caused a contract to be executed by the Western Pacific Corporation of Delaware, the entity conducting the transaction for said capitalists, with Hennessey, by the terms of which the defendants as brokers acquired a large financial interest; that certain big interests had made several unsuccessful attempts to invalidate said coveted contract. That defendants were to receive a commission of three and one-half per cent upon $6,000,000,000, that sum being the sales prices of said roads, which would yield them in commissions $210,000,000; that Hibbs, by an agreement with Hennessey, was to receive as his share of said commission approximately $60,000,000, and Hennessey was to retain the overplus, something like $150,000,000. In some instances the commissions were represented to be three per cent on $4,000,000,000 sales prices. This sum expanded as time went on. They also represented to said investors that the contract entitling them to said commission provided that said defendants should bear a certain percentage of the overhead charges and expenses, which included attorney's fees, costs of transferring stocks and other charges which had been known to reach a figure as great as $3,000 or $4,000 per day. It was further represented by the defend-

ants that they had put into the scheme a very large sum of money, but the time had come when they were no longer able to continue to carry the heavy overhead charge and they were in immediate need of money; that they had resolved to sell to said investors an interest in their brokers' contract and because of its generous terms they were amply able to pay ten dollars for every one dollar invested by third parties. In a few instances the bonus or return for the use of the money agreed upon was fifteen and twenty dollars for one dollar. Upon receipt of every sum of money or check given them a receipt was given in return, of which the following is an exact copy except as to dates, names, and amounts:

"Los Angeles, California.

[Date]

"For the sum of Ten Thousand no/100 Dollars ($10,000.00) received I agree to pay you in return at the rate of ten to one (10–1) making a total of One Hundred Thousand and no/100 Dollars ($100,000.00) this sum to be paid you at the time of closing deal known to us as a merger deal. Should said merger deal fail to be consummated and I fail to receive the commission due me from it I am held free and exempt from future liabilities (principal or principal and bonus) by you.

[Signed—Either Hibbs or Hennessey]

"Made and signed in duplicate.

[Signature of the person advancing the money]"

Two or three of the investors delivered into the possession of the defendants as much as $30,000 in $10,000 installments with the expectation and understanding that they would receive in a short time thereafter $300,000 or more to be paid out of the commissions which the defendants represented themselves entitled to receive under said contract. The Western Pacific Corporation of Delaware was represented to be the holding corporation and the Western Pacific Railroad Corporation of Delaware the purchasing corporation.

The existence of the contract made with said group of capitalists was discussed by Hibbs and Hennessey both jointly and separately with each investor prior to the making of said investment, and in each case the prospective investor was assured of the existence and validity of said

contract, but was impressively reminded that the clause therein contained enjoining secrecy was to be strictly observed for the protection of the enterprise against the manipulation of the bond and stock markets by Wall Street and the "big interests." In fact, prospective investors were informed that under no circumstances would any person be permitted to inspect said contract, and if an inspection of it was made a condition precedent to investing in the project the deal would not receive consideration. Defendants represented on occasions that the Interstate Commerce Commission had approved the merger plan in which they were interested and that the contract was in the hands of said commission and was held by it in escrow to secure the payment of the commission to Hennessey, who had been appointed a "master" by the Treasury Department in order that the commission upon the consummation of the deal would come into his hands.

Appellants make the point that in relating certain alleged false representations made by Hennessey and Hibbs all but one witness testified that defendants referred to the corporation which held possession of said contract as the "Western Pacific Corporation of Delaware," and that the only witness called to disprove this representation was the treasurer and assistant secretary of the Western Pacific *Railroad* Corporation of Delaware, who testified that there was no record in that corporation's possession of any such contract and that neither of the defendants nor the persons claimed to have been associated with them had ever had any transactions with said corporation during the eight or nine years that he had been employed by said corporation, and that none of said persons were known to him or to the corporation officers so far as he knew. One witness, however, gave the name of the corporation fully and correctly. While the fact is as stated by counsel for appellants with reference to the name of the corporation used in making the said false representations, a doubt was manifested by some of said witnesses as to whether the defendants stated the name of the corporation to be the Western Pacific Corporation of Delaware or the Western Pacific *Railroad* Corporation of Delaware. The variation was but slight. However this may be, it is very convincing from the evidence, without resorting to the testimony of said one witness

who stated that the name of said holding corporation was represented by the defendants to be the Western Pacific *Railroad* Corporation of Delaware, that the corporation which defendants had in mind and intended to identify, if indeed they did not actually do so, was the corporation last above named. The relation of the Western Pacific Corporation of California with the corporation last named, and in fact the entire proposed scheme of consolidation as explained in detail by the defendants, together with the concurrence of the same periods of time as to the identical subject matter, show beyond a reasonable doubt that the corporation intended to be identified was the Western Pacific *Railroad* Corporation of Delaware. The record shows occasional inadvertent omission of a part of the corporate name of said corporation when referred to by certain witnesses. The fact was clearly one for the jury's determination under all the evidence in the case. As a part of the conspiracy to obtain large sums of money by fraudulent methods the defendants, with a purpose of inspiring confidence in their project, represented that Fred Grant, a lawyer and nephew of General U. S. Grant, former President of the United States, was the attorney in charge of all legal matters, and he was represented as having appeared as their representative upon several occasions before the Interstate Commerce Commission and having represented them at Washington in matters of legislation and in large eastern banking and financial matters. The investors were informed of his arrivals in and departures from Los Angeles. Neither Hibbs nor any of the investors ever saw him. Mrs. Marian Grant Macy, a granddaughter of former President U. S. Grant, for some time past a resident of San Diego, had never heard of such a person as described by the defendants. Franklin F. Grant, a San Diego attorney, who has been in the practice of the law at San Diego for many years, had never heard of such a person. He never appeared in any proceeding or in any capacity before the Interstate Commerce Commission. The only person that claimed to have known Fred Grant was Hennessey. Hibbs, who had represented to the investors during the period covered by the conspiracy that he had met Grant, in a statement made by him after his arrest stated that he had never

201 Cal.—37

seen Grant and all the information he had concerning Grant came from Hennessey. The same conditions existed as to the identity of the members of the "executive board," Coleman, Hickelman, Rohrer, Callahan, and others. Not one of the investors had met any one of said executive heads, who were represented to be holding frequent executive sessions in Los Angeles. Hennessey, in a statement made by him after his arrest, was not able to give the address or whereabouts of Grant or any member of his "executive board." In fact, he did not know the Christian names of said persons. Hibbs, who affected an acquaintance with the members of said board during the period of the conspiracy, admitted that he had never seen or met any member of the "executive board."

Hennessey, in talks made at "get together" and "jollification" banquets and meetings, represented himself to be connected by blood with well-known wealthy New York families and an heir to large eastern estates from two, lines of collateral kindred. He stated that he was a nephew of the late George B. McClellan, former mayor of New York City. At one of the investors' meetings, held for the purpose of reviving confidence, he stated that rather than have the investors lose one dollar he would pay them every dollar that they had put into the enterprise out of his private fortune. Hibbs also gave out reports as to the princely possessions of Hennessey. Upon one occasion two or three of the investors with their families accompanied Hennessey and Hibbs to New York City to witness the closing of the deal. They remained in New York City for two months awaiting the final adjustment of affairs. The "executive board" was represented to be in daily sessions at the Hotel McAlpine. The investors and Hibbs daily accompanied Hennessey to said hotel. Hennessey was supposed to then go into session with the board, whereupon Hibbs and the investors would go their way. Hennessey later reported to them the progress that had been made. No investor saw or met a member of the board. After the lapse of two months Hennessey and Hibbs said matters had arisen that made it necessary for all interested to leave at once for Los Angeles. Accordingly the meeting place was transferred to Los Angeles. The "executive board," it was represented by Hen-

nessey and Hibbs, would follow on a special train or a second division of the same train carrying Hennessey, Hibbs, and the investors. It was represented that injunction suits in some of the states through which the consolidated lines passed and some matters of inside detail were delaying the closing of the project, but all difficulties were certainly to be settled in a few days. Shortly after the arrival of the party in Los Angeles, Hennessey and Hibbs announced the arrival of the executive board and attorney Grant. No investor met or had any communication with any member of the board or with Grant. Reports of the proceedings were generally communicated by Hennessey to Hibbs and by the latter to the investors. On December 20, 1924, a meeting of the investors was called and the news was broken to them that the deal had been closed and a check made out to Hennessey for $1,950,000,000 had been deposited by Grant and Hennessey with the Los Angeles branch of the Federal Reserve Bank. Hibbs remarked that this was the largest ''cash transaction in the history of railroad finance.'' The mental exhilaration produced by this announcement was somewhat reduced by another announcement which followed to the effect that a court injunction had stopped payment on said check.

Of course, the representations as to the deposit of said check or any check were shown by the evidence to be monstrously false. The defendants continued their activities for several months longer. We have not recited or referred to all acts resorted to by the defendants in the furtherance of their conspiracy to obtain money and property by fraudulent methods. To do so would extend a discussion of the machinations employed by them to an unreasonable length. Upon a review of the transactions as disclosed by the record the wonder is that persons who possess ordinary care for the affairs of life could have been so grossly deceived. Neither defendant testified in the trial of the case, but both made statements after arrest. Hibbs admitted that he collected as his part in the transaction $300,000 in Los Angeles. Hennessey stated that he personally collected $20,000 in Los Angeles and $30,000 in an eastern city. Hennessey, in his statement, claimed to have been an heir to an estate to the extent of $20,000,000 and in another to the extent

of $3,000,000. He claimed that his income amounted to $20,000 per month. Neither seems to have had any money on deposit with the banks in which they presumably dealt in Los Angeles. Much of the money collected or received by Hibbs was paid to Hennessey. Hennessey claims that he forwarded all that came into his hands to Grant, who used most of it in paying "lobbyists" to put the scheme over.

[2] The evidence overwhelmingly establishes the fraudulent purposes of the defendants. At the times the defendants were operating the policy of railroad consolidation was in high public favor and was receiving the serious consideration of the national government. Consolidations such as defendants represented themselves to be interested in were brought about. But they were consolidations with which neither of the defendants had the slightest thing to do. The question is whether the defendants or either of them had a part in any consolidation or merger plan. Every representation they made as to the existence of a material fact capable of being established by proof was shown to be false. The whole plan or scheme was builded upon deceit and falsehood. Fictitious personages, absurd and inherently improbable statements with reference to fabulous sums of money which were represented as playing a part in the transaction, and recourse made to every form of extravagant exaggeration which might tend to operate upon the minds of those sought to be influenced to the advantage of the defendants, form the woof and warp of the defendants' representations. This is not a case built up by inference upon inference, but of facts which are sufficient in law, as in the affairs of human transactions, to direct the understanding and support conclusions.

The persons who were held out to the investors as constituting the executive board of the Western Pacific Railroad Corporation of Delaware were not members thereof in point of fact and were unknown to that corporation and no such contract as the defendants represented themselves to be interested in was ever made with it or held in its possession. Neither Hennessey, Hibbs, Grant, nor any member of the "executive board" nor any person acting for it, or any of them, ever had any transaction whatsoever with said corporation. Neither did the Interstate Commerce Commission

ever have custody or knowledge of said contract, or any acquaintance with or knowledge of Hennessey, Hibbs, Grant, or said "executive board." This being so, in the absence of evidence tending to establish a contrary conclusion, the inference is irresistible that the contract never existed. Besides, there is much other evidence in the case that tends to destroy all claim as to the existence of said contract. The whole subject matter was fictitious. The representations as to the existence of the contract caused the investors to part with their money. Without those representations they would not have delivered their money into the possession of the defendants. This being so, the argument that the investors were willing to win or lose with the defendants is without force. The investors may have been willing to chance their money upon the success or failure of the enterprise, but, of course, it was upon the understanding that there was something to support the possibility of gain. The thing that was represented as furnishing the basis of the transaction did not in fact exist.

While the indictment in this case may well have alleged that the acts charged therein constituted obtaining money or property by false pretenses, we are not prepared to say that they do not constitute grand larceny. Unquestionably, the evidence is sufficient, and we must assume the jury found that the defendants entered into an agreement to obtain the possession of money and property by resorting to fraudulent methods which bear the appearance of trick or device. There can be but little doubt that the investors parted with the possession of their money influenced by the representations that it would be used by the defendants in promoting the enterprise to a conclusion in good faith. The money unlawfully obtained could not have been used for the purpose for which it was supposedly acquired and as the investors believed it would be used for the reason that there was nothing upon which it could have been expended. There being no contract in existence, a fact well known to the defendants, the moneys that came into their possession were not expended in carrying forward the enterprise which the investors intended it should aid. [3] We are satisfied that the jury was warranted in finding a preconceived design on the part of the defendants to appropriate said moneys to

their own use in furtherance of a plan and system at the time they obtained possesion thereof, accomplished by means of trick and device, and, therefore, their acts may be classed with that species of crimes denominated larceny. (*People* v. *Delbos,* 146 Cal. 734 [81 Pac. 131]; *People* v. *Shwartz,* 43 Cal. App. 696 [185 Pac. 686]; *People* v. *Edwards,* 72 Cal. App. 102 [236 Pac. 944]; 17 R. C. L. 13 and 14.)

[4] Where a false representation is made under a general plan and purpose to obtain property it is not necessary to show that a distinct representation was made in each following act if it appears or can fairly be inferred that the first false representation was still operating upon and influencing the mind of the person imposed upon. It is only in those cases where it may be fairly presumed that the first false representation has ceased to operate upon the mind of the person thus imposed upon or where there is some evidence tending to show that the first false representation had been removed that full proof of the representation must again be made. In the instant case there is no doubt that under each count the possession of the money furnished by the person alleged to have been defrauded was obtained by the representation of the defendants, made either directly by them or as a direct result of the false representations which they designedly caused to be put into circulation, as to the existence of the commission contract. Other false representations shown by the evidence were made as an aid to the accomplishment of the main purpose.

[5] That other offenses similar to the one charged in the indictment are provable against a defendant to show scienter in cases where the criminal intent is the gravamen of the charge, as in cases of fraud, is too firmly established by the decisions of this state to require a citation of cases. In the instant case we must assume that the possession of money was obtained with a criminal intent by means of trick and device. [6] The owners of the property surrendered possession of their money with the understanding that it was to be used in the accomplishment of a definite object by the defendants. It was not so used. In such cases the title does not pass. The implied finding as to the intent of the defendants cannot be disturbed by this court.

[7] We think the court did not err in permitting the witness Matthews, treasurer and assistant secretary of the

Western Pacific Railroad Corporation, to testify that he had made an examination of that corporation's records for the purposes of determining whether or not it had made or had in its possession a contract with the defendants or either of them. The purpose was to show that no such contract or reference thereto was to be found in its possession or was disclosed by its records. It is permissible for the keeper of records under such circumstances to give what is termed "negative testimony."

We find no error in the court's ruling with respect to this witness' testimony that would justify a reversal of this case.

It is conceded by appellants that if the acts committed by defendants and described by the evidence are sufficient to constitute larceny there can be no legal objection to certain instructions given by the court and objected to by the defendants. Our holding that said acts do support the judgment disposes of the objections made to said instructions.

The imposition of consecutive sentences pieces out a long term of imprisonment to which the defendants are sentenced. Whether the terms of imprisonment are disproportionate to the crimes committed is a matter that may properly be considered by another branch of our state government.

The judgments and orders appealed from are affirmed.

Preston, J., Waste, C. J., Shenk, J., and Curtis, J., concurred.

Rehearing denied.