[Crim. No. 3680.   Second Dist., Div. Two.   Sept. 16, 1943.]

THE PEOPLE, Respondent, v. FRANK E. McCABE, Appellant.

494

Frank E. McCabe in pro. per. for Appellant.

Robert W. Kenny, Attorney General, R. S. McLaughlin, Deputy Attorney General, Fred N. Howser, District Attorney, and Jere J. Sullivan and Logan Lindley, Deputies District Attorney, for Respondent.

MOORE, P. J.—With no assignments of error and with no substantial grounds for appeal, appellant asks a reversal of the judgments of his conviction of 38 felonies of which he was accused by the grand jury. Verdicts were returned on 19 counts of grand theft. Each of such counts was followed by a count charging a violation of the Corporate Securities Act. Such violation was concomitant with and constituted a part of the device designed whereby to gain possession of the sums of money taken from the several prosecution witnesses and their fellows in folly. Appellant acted as his own attorney at the trial; he did not take the witness stand; and now without a single cogent reason demands that the 38 verdicts be set aside. In view of his former conviction and his criminal methods of operating it is not astonishing that appellant should have conceived and executed a hoax of such proportions. But that it should have proceeded over a period of three years and have victimized a number of adult men and women is amazing.

The worthy citizens who fell for appellant's bold scheme and intriguing promises at times foregathered to hear reassurances of their route to fortune. Surely, but for their own innocent cupidity and their shocking credulity, the pathway of appellant to an ignominious end would at least have been delayed. The crimes of McCabe constitute a junior edition of those successfully engineered in the same community by Hibbs and Hennessey ([People v. Hennessey] 201 Cal. 568 [258 P. 49]) for whose conviction of a series of grand thefts by trick and device those suave gentlemen still languish in confinement 16 years after the prison doors closed upon them. Shall the law hold Hibbs and Hennessey who then by their schemes and cunning plundered the rich, and now release McCabe who by artifice and fraud pilfered from the poor?

Appellant was released from San Quentin in February, 1939. He was promptly employed to work in a parking lot in Los Angeles under one Carpenter who was soon informed by his new employee of a secret formula for treating cotton seed in order to improve the fiber and of his experiments with the process for over 20 years. He stated that the sale of the formula had been contracted for; that three groups were in the city to bid: viz.; (1) the South American, (2) Washington-Richmond, and (3) New York; that the price was $35,000,000; that funds were required to pay experimental and other expenses. He made substantially the same statements to investor Williams whom he informed that Roether was his agent and that he could not himself sign the notes without violating his parole; that he would pay the notes; that Taylor represented the Dupont Company; that the sale was in escrow in Phoenix; that he needed only $26,000 to complete the deal.

Appellant repeated to his other investors substantially the same statements made to Williams and to some of them he said also (1) that he had money coming from an estate in the East out of which he could discharge the notes; (2) that the agent of one of the groups bidding for the purchase was then at the Biltmore Hotel; (3) that the money advanced would be used to pay the farmers and the cost of an income tax report and the expenses of the buyers to Los Angeles; (4) that he had been offered $25,000,000 by the South American group; $27,500,000 by Dupont, and $30,000,000 by the financiers of Washington and Richmond; (5) that the farmers who had grown the experimental cotton had to be paid before the escrow could be closed; (6) that it cost more to settle with the farmers than had been at first calculated.

Appellant had gained the confidence of Mr. Roether in May, 1939, when he induced that unfortunate man to assist him by soliciting funds and by signing the notes to the investors. He told Roether he had an annual income of $12,500 which was being used in the East to discharge obligations arising from experiments. Roether repeated to the investors such statements of McCabe to whom he delivered practically all the money he collected, $55,000 in cash. Roether worked under a verbal arrangement until the expiration of appellant's parole in February, 1941. At that time appellant gave his agent a letter whereby he promised to pay all notes theretofore, and thereafter to be, signed by Roether. In the course of his activities on many occasions Roether conveyed appel-

lant to the Roosevelt Hotel to visit one Taylor who, according to McCabe, was in the city to negotiate for the purchase of the formula on behalf of Dupont. At no time, however, did the eyes of the beguiled chauffeur light upon the form of the mythical Taylor.

With the aid of Roether and by means of his frauds, appellant obtained from some 12 or 14 different individuals one or more sums of money ranging from $250 to $1,600. The victims of appellant's chicanery took the witness stand and detailed the transactions had with appellant or with his agent Roether who testified that his statements were conceived and directed by the author of the scheme.

The jury believed these witnesses. There was no contradiction of any one of them as to any material testimony. Moreover, the proof showed that there was no investigation of appellant's tax liability by the government; that Dupont had made no investigation of a process for treating cotton seed; that McCabe had never had but one bank account with the Security First National Bank, to wit: the Wilshire-La Brea branch, and that it was opened January 3, 1940, with $200; that the 41 deposits in it aggregating $12,135 were all made with cash except two.

Such proof when believed by the jury establishes grand theft. (Secs. 484, 487, Pen. Code.) There were 19 separate acts perpetrated. In each instance the sum obtained exceeded $200. Every sum taken was the result of the investor's reliance upon a false statement to the effect that the money would be used for specified purposes, made directly by appellant or conceived and put into circulation by him. Such crimes are catalogued under a special classification labled theft by trick and device. (*People* v. *Hennessey, supra; People* v. *Fawver,* 29 Cal.App.2d Supp. 775, 777 [77 P.2d 325]; *People* v. *Beilfuss,* 59 Cal.App.2d 83 [138 P.2d 332].) Such crime usually results when the victim of a fraud intends not to pass complete title to his property but that it shall be applied to a special purpose while the recipient of the property intends to appropriate it to his own use. It is on a parallel with theft by false pretense (*People* v. *Rabe,* 202 Cal. 409 [261 P. 303]). Both crimes are the fruitage of dishonesty, of a zeal wrongfully to gain possession of the property of another, of a criminal passion to cheat, swindle and defraud. The distinction between the two crimes is not important here. A discussion of the points of difference will be found in the Fawver case, *supra.* If McCabe gained

possession of the moneys upon his representation that they would be applied to a described project which did not exist, as indeed he did, his thefts were by trick and device (Sec. 484, Pen. Code; *People* v. *White,* 124 Cal.App. 548, 555 [12 P.2d 1078] ; *People* v. *Fawver, supra*). ■ To sustain a conviction for theft by trick and device no corroboration is required (*People* v. *Rial,* 23 Cal.App. 713, 719 [139 P. 661] ; *People* v. *Edwards,* 133 Cal.App. 335, 341 [24 P.2d 183]).

■ But if this cause had been tried on the theory of false pretense the record would support the judgment. The only corroboration required in the case of theft by false pretense is with reference to the pretense. Such requirement is met by proof of the same or similar statements to others · (*People* v. *Whiteside,* 58 Cal. App. 33, 41 [208 P. 132]). In such cases no other corroboration is required if the false pretense is accompanied by a false token or writing (Sec. 1110, Pen. Code). There· was not only parol evidence of the pretense in each theft but also there was abundant corroboration in the acts and words of appellant to the other investors. He outlined his entire scheme to his agent and instructed him to tell it to those persons from whom he solicited funds. Those statements were repeated by Roether to each of his victims. Also, appellant himself made his "pretense" separately to the witnesses Williams, Clark, Hurt, Johnson, Hudson, Chaffee, Runion and Tosh. Also, he addressed an assembly of 65 including some of his investors at the Y.W.C.A. of Long Beach where he repeated a number of his "pretense" statements. At the home of Mrs. Tosh he spoke before a gathering of one group to whom he repeated his fraudulent utterances. In addition to his own speech on each of the specified occasions, every representation by Roether was the act of McCabe. If they had formed a conspiracy to purloin, he was liable as co-conspirator for the acts of Roether. If the latter was a hired agent, appellant was equally liable with his agent for every act done in the execution of the agency. And withal, the testimony of each witness concerning his own conversations with appellant or Roether was corroborated not only by those had by his fellow sufferer with the two accused men but by the several statements made by McCabe to inquiring prospects as well as by the promissory notes executed by Roether and assumed by appellant in his letter to his agent on February 26, 1941. ( *People* v. *Payton,* 36 Cal.App. 2d 41 [96 P.2d 991] ; *People* v. *Donaldson,* 70 Cal. 116, 118 [11 P. 681].) It follows that by reason of the corroboration

the judgment is valid even though the theft might be deemed to have been accomplished by false representations only.

■ Not only was appellant caught in the pincers formed by the testimony of the several witnesses on the one hand and by the testimony of Roether and the notes issued to the investors on the other, but after he had been thus submerged by the cumulated evidence he dared not expose himself to the privilege of the witness stand. Such failure by him to explain or deny under oath the evidence so elaborately woven about him was itself a potent fact for the jury's consideration (Const., art. I, sec. 13) and constitutes additional support for the judgment.

■ Furthermore, appellant is faced with the rule of convenience. If he had opened an escrow for a sale of his formula, out of the myriad of possible escrowees, only he could have named the particular locus of such escrow as he might have opened. If he had negotiated with one Taylor or any other agent of the Dupont Company for their purchase of the process, he alone could furnish the name and whereabouts of the negotiator. If any farmer had grown cotton by use of appellant's "secret process," only McCabe could designate such farmer. The process of the court was available to import any of such persons whose existence and domicile lay peculiarly within appellant's knowledge, into the forum where appellant was on trial. It was therefore incumbent upon him to invoke the testimony of such persons. (*People* v. *Caldwell,* 55 Cal.App.2d 238, 251 [130 P.2d 495].)

■ At the time of receiving the moneys from the respective investors, appellant's agent executed and delivered two promissory notes, one for the sum advanced, the other in the sum of 25 times the sum advanced as the investor's participating share in the profits to be gained from the sale of the formula. The issuance and delivery of each of said participating notes was a violation of the Corporate Securities Act (Stats. 1917, p. 673; Act 3814, Deering's Gen. Laws, 1937.) Each was a "security" as defined by the act, being an evidence of indebtedness, a certificate of beneficial interest in the profits to be earned from the sale of the formula. (Sec. 2, subd. (a) 7.) If such a writing so issued by an individual creates a present right to a present or a future participation in the profits of an enterprise undertaken for profit it is a security under the act. The fact that the interest in the profits conveyed was not to be realized until the sale of the process does not make it any the less a security. (*People* v. *Oliver,* 102 Cal.

App. 29, 36 [282 P. 813]; *People* v. *Claggett,* 130 Cal.App. 141, 143 [19 P.2d 805]; *People* v. *Shafer,* 130 Cal.App. 74 [19 P.2d 861].)

Each transaction was a sale of the participating note. The issuance and sale of such a note without a permit is inhibited. (Sec. 2, subd. (a) 6; sec. 18.) No permit to sell the notes so circulated and sold by appellant and his agent was ever granted by the Commissioner of Corporations. Such sales were therefore violations of the act and for each of such infractions appellant is punishable by imprisonment in the state prison. (Sec. 18.) Not only did he take part in making representations in order to raise the money but according to Roether who was believed by the jury, such funds were delivered to appellant. Before embarking upon any enterprise to collect moneys from the public, it is incumbent upon every person so undertaking to ascertain whether his scheme, business, or enterprise has the sanction of law. (*People* v. *Stowell,* 45 Cal.App.2d 580, 583 [114 P.2d 614].) The search for new frontiers too frequently leads the bold, the dishonest and the less discriminating to impose upon those who are susceptible and who are ambitious to improve their status. It is a proper exercise of the sovereignty to protect the latter class by such legislation as the Corporate Securities Act.

Appellant declares that he was prejudiced (1) by the references to his former conviction, (2) by the unethical conduct of Roether's counsel, and (3) by adverse rulings of the court. So far as we have been able to explore the record we find no allusions to his prior conviction except by witnesses who recited the conversations had with appellant relative to his inability to sign the notes or by those who testified as to the representations of Roether. The assigned "unethical conduct" of Roether's counsel is a fantasy. From appellant's closing brief we learn that he deems himself aggrieved because the court directed appellant instead of Roether's counsel to follow the district attorney in the argument. Such procedure was within the court's discretion. The detrimental rulings of the court referred to by appellant have not been pointed out. We find none. If there be such, it was incumbent upon appellant to specify the pages of the transcript where they are reported (*People* v. *Jenkins,* 118 Cal.App. 115 [4 P.2d 799]).

It turns out that this appeal has neither points (rule 15

of this court) nor assigned errors (*People* v. *Schlosser*, 99 Cal.App. 593 [278 P. 898]) nor argument, nor authority. (*People* v. *Jenkins, supra.*) It appears to be merely a beseeching by the wretched man that he have special favor extended to him because he, in his own person, presents his own cause. Neither does his personal advocacy of his cause entitle him to any advantage over other convicts nor does the fact that he is serving his sentence confer upon him a right to which he were not entitled had he been represented by a Webster. (*Frey* v. *Superior Court*, 5 Cal.App.2d 534, 536 [43 P.2d 342].) It is the genius of our law that it be universally applied so far as the power of ascertaining the facts will enable the courts to determine the category into which the acts of an accused may fall. When a jury under proper guidance has determined that a prisoner has been guilty of grand theft by trick and device, it is the duty of the court to sentence such criminal to the state prison just as was done for Hibbs and Hennessey. The more constantly uniform the application of the criminal law, the more will it be dreaded by those dry land buccaneers who defy statutes if they can discern a course by which they may be evaded.

The judgments are affirmed.

Wood (W. J.), J., and McComb, J., concurred.