[Crim. No. 4214. Second Dist., Div. Two. June 29, 1948.]

THE PEOPLE, Respondent, v. MONTE G. MASON, Appellant.

N. E. Youngblood for Appellant.

Fred N. Howser, Attorney General, Henry A. Dietz, Deputy Attorney General, William E. Simpson, District Attorney,

Jere Sullivan and H. L. Arterberry, Deputy District Attorneys, for Respondent.

MOORE, P. J.—Appellant was convicted of eight felonies: two for grand theft, counts I and VIII; six for violating the Corporate Securities Act, counts IX and III to VII inclusive. As grounds for reversal of the judgments and the order denying a new trial it is now contended that (1) "the evidence was insufficient to support the judgment of conviction"; (2) "the court erred by admitting evidence of other sales"; (3) the district attorney was guilty of prejudicial misconduct.

### The Proof Supports the Judgment on Count I

Inasmuch as counts III to IX grew out of appellant's connection with a different corporation from that mentioned in count I, by a discussion of the evidence upon the latter count an attempt will first be made to determine whether the proof was sufficient to warrant the conviction of grand theft as there charged.

Appellant was secretary-treasurer of the Americal Exploration, Incorporated, in the fall of 1944. He had an office in Hollywood and resided in Burbank. He asserted the corporation's ownership of an oil well near McKittrick in Kern County and that at the time in question the hole had been drilled below 5,000 feet. The complaining witness, Miss Brevik, lived in Berkeley; owned a convertible automobile of 1941 vintage. While in Los Angeles she was told by her friend, Mr. Enders, of appellant's oil well, and they visited the latter's home about November 1, 1944, where in the presence of Enders and Mrs. Mason appellant told her the well had reached a depth of 5,500 feet, and that they "expected it to come in at any time." Pursuant to appointment Miss Brevik drove the quartet to McKittrick, saw the derrick, the tools and men at work and small particles of oil which appellant said were coming from the well. He told her that he had invested $50,000 in the well as operating expenses; that she could get in because she was a friend of Enders; that the deal was "sure-fire" to strike oil which would enhance the value of the Americal Exploration stock four to six times; that they would drill more wells. "A few days later"—November 2, 1944—she and Enders called on appellant at his office. He then told her that the corporation "needed money for oil drilling equipment and that by turning in an automobile for equipment he could get a great deal

better deal." The witness then agreed to transfer to appellant her automobile, worth $4,500, for a certificate of 4,000 shares of the stock of Americal Exploration, Incorporated, which stood in the name of appellant. It was signed by M. G. Mason as secretary. He assigned the certificate to her in the presence of Enders and she assigned her certificate of ownership of the car and delivered it to appellant.

Miss Brevik never received any income on the stock or anything for it. A short time later she visited the "well," found it "totally shut down," only the derrick and tools were there and they were idle. In her talks with appellant about the well he told her there was trouble but they would begin drilling again. But when she finally, about January 1, 1946, visited the scene again the premises were still deserted. Although appellant told Enders that he had obtained $10,000 of drilling equipment for the convertible, the proof was that appellant sold the car to one McFadden, a secondhand dealer in Hollywood, for $1,800. He testified to nothing substantially contradictory of the testimony of the state's witnesses except that he declared that McFadden had paid him only $1,400 for the vehicle, the O.P.A. ceiling price.

The foregoing facts support the conviction under count I. Appellant's statement that the corporation needed drilling equipment and that Miss Brevik's automobile would be used for obtaining such equipment are evidence of his false pretense. Also, his statement that the company planned to drill other wells accompanied by his declaration of the well's depth of 5,500 feet was an implied representation that the company was financed for extensive operations. Such representations disclose his intent to deceive and effected a fraud by causing Miss Brevik to part with her property for worthless stock. The complainant was corroborated by the witnesses Enders and McFadden and by appellant's admissions. (Pen. Code, §§ 484, 1110; Fricke, Criminal Law (2d ed.), pp. 205, 215.)

While it has been held that under section 484 a false representation must relate to a past or present fact to support a conviction (*People* v. *Jackson,* 24 Cal.App.2d 182, 203 [74 P.2d 1085]), yet it is now established that a fraud can be just as easily perpetrated by a promise to do an act if the promisor at the time of such promise entertains a present intention of not performing his contract. (*People* v. *Gordon,* 71 Cal.App.2d 606, 624 [163 P.2d 110]; *People* v.

450

*Ames,* 61 Cal.App.2d 522, 531 [143 P.2d 92].) The secret intention of a contracting party not to perform a promised act which induces his contractee to execute their agreement is an essential feature of his representation, and may be just as effective in the matter of inducing the contract as would be the declaration of a vendor that the crystalized chassis of his old motor car is new steel or that the termite-infested foundation of his house is made of cement. (See *People* v. *Gordon, supra.*) ■ Whether a promise made to effect a transaction by subverting the will and judgment of the promisee was dishonest is a matter for the determination of the trier of fact, and in the absence of prejudicial error on the trial of the issues such determination will not be disturbed on appeal.

■ However, if perchance the trial court might have rejected the thesis of appellant's guilt on the theory that his promise could not constitute a fraudulent statement as provided by section 484, then it was warranted in concluding that such promise was a trick and device whereby to acquire possession and ownership of the automobile and that he was, therefore guilty of grand theft. (*People* v. *Hennessey,* 201 Cal. 568, 581 [258 P. 49].) It cannot be denied that the statement and promise of appellant reasonably justified the implied finding that complainant transferred her automobile to appellant solely by reason of such promise and statements to her and to Enders. They represented the financial soundness of the corporation and a definite plan to increase its production. Both were golden snares for the unwary, and when made by a clever promoter in the presence of a derrick and tools and an active effort to penetrate deep oil-bearing strata they were irresistible. Confronted with such evidence a trial court should find no difficulty in finding that the accused was inspired by a sinister design to acquire his victim's property and that he did so by trick and device.

■ But the validity of the judgment is not to be determined solely by the merits of appellant's promise to use the automobile for the purpose of obtaining other drilling machinery. When he stated that the corporation had plans for drilling additional wells the implication was unavoidable that it was possessed of sufficient finances for further subterranean explorations. Such representation was substantial in character; was calculated to deceive, and did deceive. It was material to the issue of theft (Pen. Code, § 484) and related to an existing fact. The trial court was warranted

in drawing such an inference, and that supports a finding of grand theft on the theory of either false pretense or trick and device. (*People* v. *Hennessey, supra.*)

## Count VIII

The only conviction for grand theft other than count I is that alleged in count VIII whereby appellant was accused of grand theft in that by false pretense he feloniously took $5,000 from one Bertrand on July 23, 1946. The proof was that about June 17, 1945, appellant and three others, to wit, Messrs. Thaheld, Landry and Wallace, acquired an option to purchase the patent rights to a diesel motor then held by the Shaffer Tool Works, vendee of one Thaheld, the inventor. They caused to be organized Diesel Power, Incorporated, a Nevada corporation, about June 20, 1946, for which appellant paid the United States Corporation Service approximately $400. Accompanied by his associates and one Barton about July 2, 1946, appellant visited Las Vegas, Nevada, where they took over the corporation. At the meeting held there the optionees were installed as directors and officers: Landry, president, Thaheld, vice president, Wallace, secretary-treasurer, and appellant, chairman of the board. Of the total authorized capital stock, 500,000 shares were then issued to Landry, Thaheld, Wallace and Mason in equal shares in payment for the option to purchase the patent rights.

Upon their return to Los Angeles appellant proceeded to act as general promoter of the company's interests and to make sales of his "personally owned shares" without first having obtained a permit from the corporation commissioner of this state. He was introduced by Barton to the witness Bertrand in July, 1946, as an officer of the corporation and salesmanager of its stock. He immediately offered Bertrand 20,000 of such shares for $13,333, falsely stating that he had "picked up" the stock from Barton. After Bertrand had declined to make the purchase and appellant had unsuccessfully attempted to induce Mrs. Bertrand to consent to the investment, appellant stated: "We are going to do something about this immediately, because I have to go to the S. E. C. and file on this tomorrow before noon, and I promised Mr. Barton that I would take care of this for him and see that you were in on this, so you would not miss purchasing the stock." Bertrand then told appellant that he could raise $12,500 on some of his real property and would like to

borrow $40,000 on his building. In event of such loan he "could buy a lot of the stock." Appellant thereupon stated that he could get a loan for him, and made other statements hereinafter set forth. Pursuant to their discussion and appointment, appellant met Bertrand at a bank designated by the latter on the following day and at once repeated that he had to file with S. E. C. before noon; that if Bertrand would make a deposit of $5,000 on the stock he could procure a loan of $40,000 for him; that he would hold the deposit in trust until he got the loan through. Bertrand borrowed $6,000 from the bank, and in reliance upon the promise of appellant to place the money in trust he paid appellant $5,000 and received from appellant certificate Number 10 from the stock book of Diesel Power, Incorporated, for 20,000 shares in favor of Bertrand and wife. Appellant did not procure the loan he promised and never returned the $5,000 although demand therefor was made. On September 6, Barton and Landry met appellant at his bank to see the record of the trust fund account which appellant had promised to establish for Bertrand in the amount of $5,000. In response to their request to see the trust account appellant replied that "the Cashier had the funds between the pages of a book and nobody else knew where it was."

In an ostensible attempt to obtain the loan of $40,000 for Bertrand appellant accompanied by a stranger visited Bertrand's place of business on the very day he received the $5,000 to inspect the property to be mortgaged. When Bertrand inquired by telephone later concerning the loan, appellant advised him that the prospective mortgagee had suffered a heart attack and that he could not be seen. That concluded appellant's efforts to perform his agreement made at the time of receiving the $5,000 which the court believed in fact never to have been held in trust for a moment.

Such evidence lacked none of the essentials of grand theft. Either appellant held Bertrand's money for a while and embezzled it or promptly upon receipt of it, he appropriated it to his own use. In either event he was guilty of grand theft. Inasmuch as appellant took the $5,000 to hold in trust an embezzlement could have occurred at any time after the money was received, and it would have been grand theft under section 484, Penal Code. (*People* v. *Cannon*, 77 Cal.App.2d 678, 689 [176 P.2d 409].) But since the evidence supports an implied finding that at the time of his receipt of the money appellant intended permanently to

deprive Bertrand of its ownership, then his conviction of grand theft was also justified on the theory of larceny by trick and device. (*People* v. *Hennessey,* 201 Cal. 568, 581 [258 P. 49] ; *People* v. *Jones,* 61 Cal.App.2d 608, 620 [143 P.2d 726] ; *People* v. *Von Badenthal,* 8 Cal.App.2d 404, 408 [48 P.2d 82].)

### *Evidence of Similar Transactions Not Error*

■ For the purpose of establishing the perfidy of appellant at the times of his obtaining the moneys from the witnesses Brevik and Bertrand the prosecution introduced testimony of nine separate transactions. All involved (1) sales of the diesel stock and false statements as to the properties, progress earnings and dividends of the corporation, or (2) false statements as to his own wealth. From the victims of such misrepresentations he obtained sums ranging from $1,000 to $16,000—no part of which was in any instance ever repaid and for which the victims received nothing of value. There was no error in admitting the evidence of such transactions. They were of the same common design and pattern as that perpetrated upon Bertrand at the time of obtaining the $5,000, and in time reasonably near the transactions with him. They demonstrated appellant's motive, plan, design and criminal intent, and the evidence thereof was therefore properly received. (*People* v. *Thorne,* 10 Cal.2d 705, 708 [76 P.2d 491] ; *People* v. *Hennessey,* 201 Cal. 568, 582 [258 P. 49] ; *People* v. *Gordon,* 71 Cal.App.2d 606, 631 [163 P.2d 110] ; *People* v. *Gray,* 52 Cal.App.2d 620, 657 [127 P.2d 72].) ■ Where several crimes of the accused are of the same general character and tend to the same common end, evidence thereof is admissible to show the motive which impelled the perpetration of the crime for which the defendant is on trial in order to show that the crime charged was a section of the pattern of his life and character. (*People* v. *Dunn,* 40 Cal.App.2d 6, 16 [104 P.2d 119].)

### *Counts III, IV, V, VI, and VII Were Established*

By these five counts appellant was accused of selling and issuing to the parties named therein shares of stock in Diesel Power, Incorporated, without first having applied for and secured a permit from the Commissioner of Corporations of California so to do. The only attack made upon these judgments is that the stock sold as alleged in the five counts was "personally owned stock" in that appellant as owner thereof

in Nevada imported the stock into California and as such owner made the sales specified. He contends that the sales mentioned in the five counts are specifically exempted by the provisions of the Corporate Securities Act. On the contrary, by section 2, subdivision (c)-3 (Stats. 1917, p. 673; 2 Deering's Gen. Laws, Act 3814), it is provided that the provisions of the act shall not apply to the sale of a security when made by a vendor not the issuer thereof who, "being a *bona fide owner of such securities, disposes of his own property for his own account, and such sale is not made, directly or indirectly, for the benefit of the issuer or an underwriter of such security, or for the direct or indirect promotion of any scheme or enterprise with the intent of violating or evading any provision of this act.*" (Emphasis added.) This language is tantamount to declaring it to be a felony if by the sale of a security prior to the issuance of a permit to the issuer by the Corporation Commissioner the vendor causes the issuer thereof to profit or to be advanced by such sale. The uses to which appellant applied portions of his proceeds of sales of the diesel stock fully justify the implied finding that he sold his "personally owned" stock for the benefit of the corporation.

After the corporation's organization appellant and his associates took over its affairs at Las Vegas on July 2, 1946. When the certificates were written for each of the four parties sharing in the issue there was no stock certificate book. Detached, loose certificates were utilized. Subsequently, at Los Angeles, appellant obtained a book of certificates and made the entries on the stubs. He kept possession of the stock certificate book until about December 1, 1946. He interested Barton, a friend of Thaheld, in the promotion of Diesel Power, Incorporated, and advised him that purchases of the stock could be made only through appellant personally prior to the issuance of a permit to the corporation. For the purpose of aiding appellant to effect sales of his shares Barton contacted the following persons on the following dates and received from them their checks for the following sums, to wit:

| Name | Date | Shares | Sum |
|------|------|--------|-----|
| Haslett | July 9, 1946 | 7,500 | $5,000 |
| Dunn | July 9, 1946 | 7,500 | 5,000 |
| Lowry | July 9, 1946 | 3,000 | 2,000 |
| Small | July 9, 1946 | 3,000 | 2,000 |
| Haslett | Sept. 4, 1946 | 7,500 | 5,000 |

Also, on July 23, 1946, appellant in person sold 20,000 shares to Bertrand and received $5,000 on account.

 The following events warranted the implied finding that such sales were made for the promotion of the corporation and "with the intent of violating or evading" provisions of the Corporate Securities Act. On July 9, 1946, appellant opened an account in Los Angeles with the California Bank, Sixth and Western Branch, wherein he deposited all checks of the named vendees. Subsequently he drew checks against that account in payment of the following debts of the corporation: (a) printing bills in the sum of $1,026.38; (b) the $2,000 June, 1946, installment on the option to purchase the diesel patent rights; (c) expenses of Barton, Thaheld and himself in excess of $800 to Chicago to confer with the officers of an aviation company; (d) $2,000 due for the July, 1946, installment on the option to purchase the patent rights; (f) in addition to the foregoing, in August, 1946, appellant used the $800 which he had borrowed from Bertrand for the purpose of making the trip to Chicago in August of that year.

It was only by reason of appellant's deposit of Haslett's check of $5,000 that he was enabled to make payment of two of the option installments.

Not having first obtained a permit to issue and sell the shares of the diesel corporation, the conclusion from the incontestable facts that appellant had violated the act is unimpeachable. (*People* v. *McCabe,* 60 Cal.App.2d 492, 499 [141 P.2d 54].) It is the duty of every prospective vendor of securities first to ascertain whether a permit has been issued for such sale by the sovereign power. (*People* v. *Stowell,* 45 Cal.App.2d 580, 584 [114 P.2d 614].) The authorities cited by appellant neither defeat nor assuage the judgment here for review. (*People* v. *Smith,* 111 Cal.App. 177 [295 P. 105] ; *People* v. *Murphy,* 17 Cal.App.2d 575 [62 P.2d 592].) Smith's conviction was affirmed notwithstanding his defense paralleled that of Mason. The jury was not compelled to believe his testimony but was entitled to consider the circumstances as to whether he was owner or acting for the corporation. In the Murphy case the facts were held less favorable to an acquittal than were the facts in the Smith case.

### No Prejudicial Misconduct

 Appellant bases his claims of misconduct by the deputy district attorney upon the latter's asking leading and suggestive questions on direct examination of the witnesses

Brevik, Landry and Barton notwithstanding appellant's objections thereto. Not only is it proper to ask leading questions when they are designed more quickly to reach the testimony material to the issues (*People* v. *Orona*, 79 Cal.App.2d 820, 827 [180 P.2d 694]), but the trial court has a wide discretion in determining the extent to which such questions may be asked. (*People* v. *Wilson*, 46 Cal.App.2d 218, 224 [115 P.2d 598].) In defining the term "leading question" (Code Civ. Proc., § 2046) as one "which suggests to the witness the answer which the examining party desires" the Legislature contemplated only answers material to the issue under consideration. For the orderly expedition of a trial it is proper by leading questions for the examiner to place the circumstances of the witness before the court. (See Wellman's "Day in Court," p. 152 and "Art of Cross-examination.")

The judgments and the order denying the motion for a new trial are affirmed.

McComb, J., and Wilson, J., concurred.

A petition for a rehearing was denied July 8, 1948.